## ROGERS PLAZA, INC. *v.* S. S. KRESGE COMPANY

1. CONTRACTS—IMPOSSIBILITY OF PERFORMANCE—ORIGINAL IMPOSSIBILITY—SUPERVENING IMPOSSIBILITY.

   Impossibility of performance of a promise may be classified as original impossibility or supervening impossibility; original impossibility of performance exists when the contract was entered into, so that the contract was to do something which from the outset was impossible; supervening impossibility is that which develops some time after the inception of the contract.

2. CONTRACTS—IMPOSSIBILITY OF PERFORMANCE—ORIGINAL IMPOSSIBILITY—EFFECT.

   A promise is void where performance is impossible because of facts existing when the promise was made unless the risk of impossibility was assumed by the parties.

3. CONTRACTS—IMPOSSIBILITY OF PERFORMANCE—PROMISOR'S KNOWLEDGE—EFFECT.

   Impossibility of performance of a promise does not excuse performance where the impossibility of performance exists because of facts which the promisor alone knew when he made the contract.

4. CONTRACTS—IMPOSSIBILITY OF PERFORMANCE—PARTIAL IMPOSSIBILITY.

   Conditions that render performance of a promise impossible do not terminate the contract *ab initio;* performance is excused only to the extent to which performance is impossible.

REFERENCES FOR POINTS IN HEADNOTES

[1–4] 17 Am Jur 2d, Contracts § 404 *et seq.*
[5] 49 Am Jur 2d, Landlord and Tenant § 41.
[6] 17 Am Jur 2d, Contracts § 376.
[7] 49 Am Jur 2d, Landlord and Tenant §§ 145–153.

5. Landlord and Tenant—Impossibility of Performance—Excused Performance.

Performance of a clause of a lease to provide a parking area to building area ratio of 2.7:1 in a shopping center was properly excused where the plot plan, which had accurate measurements, showed that at the time the clause was agreed to, the ratio was impossible to obtain and both parties were, in good faith, unaware of the impossibility.

6. Contracts—Substantial Performance—Definition.

Substantial performance means doing something other than what was promised that is just as good as the promised performance or good enough for both parties; substantial performance requires a good-faith attempt to perform without intentional or material departures.

7. Landlord and Tenant—Modification of Lease.

Statement of a developer of a shopping center to one of its tenants in a letter, asking for an amendment of the parties' lease, that it had always planned on the addition of a store "requiring a minimum of 50,000 square feet of ground floor area, and possibly 100,000 square feet of gross building area", whether meaning that a "maximum" of ground area existed and could be used or whether meaning that the developer hoped to find a tenant for 50,000 square feet of ground area, as indicated on the center's plot plan, had no effect on the parties' lease where the tenant did not sign the letter, and approved only the proposed lease amendment.

Appeal from Kent, John T. Letts, J.   Submitted Division 3 January 8, 1971, at Grand Rapids   (Docket No. 9984.)   Decided April 23, 1971.

Complaint by Rogers Plaza, Inc. and Connecticut Mutual Life Insurance Company against S. S. Kresge Company seeking a declaratory judgment of the rights of the parties under a written lease, an injunction to enforce those rights, and a reformation of the lease.   Judgment for plaintiffs.   Defendant appeals.   Reversed in part, affirmed in part, and remanded.

*McShane, Bowie, Twomey, Jacobson & Shearer* and *Warner, Norcross & Judd* (*J. M. Neath, Jr.,* of counsel), for plaintiffs.

*Law, Buchen, Weather, Richardson & Dutcher,* for defendant.

Before: HOLBROOK, P. J., and McGREGOR and T. M. BURNS, JJ.

HOLBROOK, P. J. This action was brought in the Circuit Court for Kent County by plaintiffs against defendant for a declaratory judgment of the rights of the parties under a written lease. Plaintiffs also sought reformation of the lease and an injunction restraining defendant from interfering with plaintiffs' construction of a proposed additional building in the Rogers Plaza owned by plaintiff Connecticut Mutual Life Insurance Company.

A resume of the background leading up to the bringing of this action is advisable.

In 1959, Pioneer Shopping Center, Inc. (hereinafter referred to as Pioneer), the former owner of the land involved herein, was in the process of developing and building a modern, enclosed, air-conditioned mall to be known as the Rogers Plaza.

On July 22, 1959, Pioneer, as lessor, and the S. S. Kresge Company (hereinafter referred to as Kresge) entered into a lease for 8,000 square feet in the mall for a primary term of 20 years with options to Kresge to extend the lease for three five-year periods. This permitted the term to be extended to 1995. The minimum rental provided to be paid by Kresge was $32,000 per year plus 4% of the gross annual sales exceeding $710,000. Kresge also agreed to pay up to $1,800 per year for its *pro rata* share of the cost of maintaining the parking area.

Paragraph nine of the lease provides for the parking area to be maintained by Pioneer and reads in pertinent part as follows:

"9. Landlord shall provide as of commencement date of this Lease and shall maintain for the full term and any extensions thereof at its own cost and expense in the areas designated 'Parking' on Exhibit 'B' Parking Facilities either in ratio of four (4) square feet of parking area to one (1) square foot of gross building area, or sufficient to accommodate not less than three thousand (3000) automobiles, whichever shall be the greater. Said Parking Facilities including necessary sidewalks and driveways shall be for the free parking of automobiles of invitees of tenants of the Commercial Development and shall be located and arranged substantially as shown on Exhibit 'B'."

In 1961, Pioneer determined that it could not furnish a parking area ratio to gross building area of 4 to 1 and wrote Kresge the following letter:

"June 28, 1961
"Reply to: Pioneer Shopping Center, Inc.
1029 Portage Street
Kalamazoo, Michigan
"S. S. Kresge Company
2727 Second Avenue
Detroit 32, Michigan
Attention: Mr. W. H. Shipley
Real Estate Representative
Gentlemen:
"Rogers Plaza Shopping Center
Wyoming, Michigan
"In accordance with our conversation in your office on Thursday, June 22, 1961, we are hereby requesting a modification to Article 9 of the lease with Pioneer Shopping Center, Inc., dated July 22, 1959. The modification consists of two items, namely,

"1. Reduction of 'ratio of four (4) square feet of parking area to one (1) square foot of gross building area,' to *two and seven tenths (2.7) to one (1).*'

"2. Reduction of '3000 automobiles,' to *2700 automobiles.*'

"Our request for this modification is necessitated by the fact that the buildings already under construction will only produce a ratio of 3.617 to 1, instead of 4 to 1, and Metropolitan Life Insurance Company has requested that this matter be clarified before advancing additional funds. We have also always planned on a potential addition of a high grade department store requiring a minimum of 50,000 square feet of ground floor area, and possibly 100,000 square feet of gross building area. Such an addition would reduce the ratio of gross building area to parking area to 2,679 to 1. "The reduction of 3,000 automobiles to 2,700 automobiles is intended to provide for the reduction of parking at the time the department store addition is added to the center. "S. S. Kresge Company       "–2–        6/28/61 "The following statistics may be helpful in your consideration of our request:

| | |
|---|---|
| "Gross land area per letter from Williams & Works, dated 6/26/61 | 1,478,862 sq. ft. |
| "Ground floor rentable area per Willard Thorsen, Architect | 251,837 sq. ft. |
| "Land available for parking, walks, mall, etc. | 1,227,025 sq. ft. |
| "Gross building area | |
| "Ground floor | 251,837 sq. ft. |
| "Second floor | 49,551 sq. ft. |
| "Basement | 31,528 sq. ft. |
| "Penthouse | 4,869 sq. ft. |
| "Mezzanine | 1,415 sq. ft. |
| | 339,200 sq. ft. |

"Ratio of gross building area
  to land available for park-
   ing [sic]     1,227,025 to 339,200 = 3.617 to 1
"Ratio after expansion
              "1,227,025 to 339,200
              "— 50,000    100,000

              "1,177,025 to 439,200 = 2.679/1

"Our request is further supported by the fact that we have recently obtained approval from W. T. Grant Company for a reduction of ratio from 3.5 to 1 to 2.8 to 1, and a reduction of automobiles from 3,000 to 2,700. A copy of a letter from W. T. Grant Company is enclosed. We have been assured by Mr. Ed. Pehrson of Montgomery Ward & Company that they will reduce their ratio requirement from 3.5 to 1 to 2.7 to 1, and as showed you in your office, their automobile requirement was originally only 2,700 automobiles.

"We are extremely anxious to obtain this modification in order to receive additional construction financing by having Metropolitan Life Insurance Co. assure the National Bank of Detroit of the maximum take-out permitted by our permanent financing commitment. An examination of all our leases to date shows only three exceptions, and we have already cleared up Montgomery Ward & Company and W. T. Grant Company. Your cooperation will be greatly appreciated.

"We have enclosed, for your use, copies of areas as computed by our architects, and our parking lot layout.

        "Very truly yours,
        "PIONEER SHOPPING CENTER, INC.
        "[signed] Robert D. Britigan
        "Robert D. Britigan
        "Executive Vice President"

As a result of this letter, paragraph nine of the

lease was changed by an amendment to the lease, dated July 7, 1961, as follows:

"1. Article 9 of said Lease Agreement, designated in the margin as 'Parking Facilities' is amended as follows:

"A. In line 3 of said paragraph, the words 'four (4) square feet of parking area to one (1)' are deleted and in substitution therefor the following words are inserted:

" 'two and seven tenths (2.7) square feet of parking area to one (1) * * * .'

"B. In lines 4 and 5 of said paragraph, the words 'three thousand (3000)' are deleted and in substitution therefor the following is inserted:

" ' * * * two thousand seven hundred (2,700) * * * .' "

In January 1966, Pioneer sent Kresge a letter agreement which was executed by both parties which permitted all tenants of Rogers Plaza to have the same plot plan. This letter agreement reads as follows:

"S. S. Kresge Company
2727 Second Avenue
Detroit, Michigan    48232
"Dear Mr. Cook:
"As a tenant in Rogers Plaza Shopping Center, your lease, and possibly your memorandum of lease, had attached to it an Exhibit 'A' (or in some cases, it was known as Exhibit 'B'), which was a plot plan of the Center purporting to show the parking areas, a future building at the East end of the Center and, in some cases, a free standing bank building located in the Northeast corner of the Center. These plot plans were changed several times during the leasing period and there is a definite lack of uniformity in them.

"Attached hereto is a plot plan of the Center, prepared by Daverman Associates, dated August 26, 1965. This plot plan shows the location of present and future buildings and contains general information concerning the parking areas as they now exist and as they will exist when, as and if all future buildings are completed.

"Pioneer Shopping Center desires to substitute this plan in all leases and memorandums of leases as a uniform Exhibit 'A' after which Pioneer will take its first step in the expansion of the Center by entering into a formal agreement for the construction of the free standing Old Kent Bank Building.

"It is proposed that when you, as a tenant, have approved the substitution of the attached plot plan for whatever plot plan was attached as an exhibit to your lease and memorandum of lease, this substituted plot plan will act as an amendment to your lease insofar as your lease contains any restrictions on the construction of future buildings or the curtailment of parking, where such restrictions are different from the attached exhibit dated August 26, 1965.

"If this is satisfactory to you, please initial the exhibit attached to the enclosed copy of this letter and sign and return the enclosed copy of this letter. Keep the original letter and the copy of the exhibit which is attached to it for your files.

"We will appreciate your early attention to this matter, so that we may consummate our plans as soon as possible.

"Very truly yours
PIONEER SHOPPING CENTER, INC.
By s/ _____
M. P. Doyle
Executive Vice President
January 25, 1966

As a tenant of Rogers Plaza Shopping Center under

a written lease with Pioneer Shopping Center, Inc., as landlord, we agree to the above.

S. S. Kresge Company
_____
          (Tenant)

By s/_____

John B. Hollister, Vice Pres. (Title)"

The plot plan attached to the letter agreement is reproduced in the appendix to this opinion and marked a part of exhibit 11, and the plot plan attached to the original lease is reproduced also and marked a part of exhibit 2.

It is undisputed that this mall was to be in the shape of a dumbbell with a large department store on each end. Montgomery Ward was located on the west end, but Pioneer was unsuccessful in obtaining a department store to locate on the east end of the mall.

Pioneer failed to make a profit on the operation of the Plaza and became desirous of selling its fee title, subject to a mortgage, to Connecticut Mutual Life Insurance Company (hereinafter referred to as Connecticut Mutual) with some of the owners of Pioneer (Erwin Rogers and Patrick Doyle) forming a new corporation, Rogers Plaza, Inc., which would then take a lease-back from Connecticut Mutual for the Plaza under terms that were agreed upon.

These actions were accomplished in June 1966, and the lease from Connecticut Mutual to Rogers Plaza, Inc., dated July 1, 1966, was executed by both parties. In the latter part of 1969, and the forepart of 1970, Rogers Plaza, Inc., was in financial difficulties because the income from the mall had decreased and the expenses made it an unprofitable venture. It was believed that if they were able to get a department store as a tenant on the east end of the mall, it would bring in more business and

Rogers Plaza, Inc., might be able to survive. Rogers Plaza, Inc., had previously endeavored to find a tenant that would be satisfactory to be added to the east end of the mall, and in the latter part of 1969 held conversations with representatives of Jewel Companies, Inc., (hereinafter referred to as Jewel) for one of their Turn-Style stores to be located in the Plaza. Finally, Jewel informed Rogers Plaza that they would locate in plaintiffs' mall only if they could have a building 250 by 400 feet (or 100,000 square feet of space) on the ground level. Because Rogers Plaza could not raise the funds to construct the building and possibly for other reasons, it released its interests as to the proposed Turn-Style location under their lease to Connecticut Mutual who agreed to undertake the project and lease direct to Jewel Companies, Inc. At this point in time, representatives of Connecticut Mutual proceeded to obtain consents from the 32 tenants in the mall to permit the Turn-Style store to become a part of the east end of the Plaza with 100,000 square feet of space on the ground level.

The respective plot plans, made a part of defendant's lease, indicated a reservation of space at the east end of the mall to accommodate a building of 250 by 200 feet (or 50,000 square feet of ground level space) and a possible second story or basement of similar size accommodating 100,000 square feet of usable space.

In January 1970, Rogers Plaza, Inc., and Connecticut Mutual sent out letters to the tenants of the plaza with an amended plot plan showing the location of the Turn-Style store as described above and asking that an enclosed consent form be signed and that the plot plan enclosed be substituted for that attached to the respective leases. Most of the

tenants executed the consents without requiring any concessions in their lease or further benefits. However, as appears in the testimony of Mr. Doyle, president of Rogers Plaza, Inc., certain tenants did require and receive concessions and benefits when they gave their consent. This testimony, in part, is as follows:

"*Q.* I think you indicated in your complaint, as to which you stated under oath that it was accurate, that consents had been obtained from all the other tenants at Rogers Plaza with reference to proposed construction of the Turn-Style Store, is that correct, other than Kresge?

"*A.* I think that is substantially correct, yes.

"*Q.* And you realize here in open court, and in the position taken in the pleadings, that Kresge has given its consent provided it be on two levels?

"*A.* That consent is meaningless, absolutely meaningless.

"*Q.* Are the contracts on which that consent is based likewise meaningless, Mr. Doyle?

"*Mr. Neath:* That calls for a conclusion.

"*Mr. Hunting:* I will withdraw the question.

"*Q.* You deemed it necessary, did you not, Mr. Doyle, to seek the formal consent of all other tenants with reference to this proposed construction?

"*A.* Yes.

"*Q.* Montgomery Ward, as a condition to giving its consent, demanded a number of repairs be made, did it not?

"*A.* I don't know about repairs. I think improvements is a better word.

"*Q.* I think there has been some testimony that the cost of those improvements may be approximately $80,000?

"*A.* $80,000 to $100,000, the figures I have.

"*Q*. And the performance of these improvements was attached as a condition to the consent given by Montgomery Ward?

"*A*. I believe that is correct.

"*Q*. There isn't any question about it, is there? Were there not six or seven conditions imposed by Montgomery Ward with reference to giving of its consent, all of them pertaining to improvements or repairs that must be made?

"*A*. I believe I read that, yes. If that is the same letter, I so testified.

"*Q*. Did Cunningham Drugs give you an unqualified consent without attempting to exact some special terms from you?

"*A*. They sure didn't.

"*Q*. As a matter of fact, they were concerned about Turn-Style as a competitor, were they not?

"*A*. Yes.

"*Q*. As a matter of fact, they insisted that Turn-Style could not sublet any particular portion of the Turn-Style for purposes of selling prescription drugs?

"*A*. Well, I think you have to ask that question in its proper context. Turn-Style does have a pharmacy and will operate a pharmacy in their store. Now, to sublet the pharmacy is something else again. Cunningham Drugs does not want Muir Drugs or somebody else walking in there and becoming their direct competitor, is the reason for that requirement.

"*Q*. Cunningham Drugs also exacted some other special conditions, did they not?

"*A*. No.

"*Q*. Is it your testimony under oath that they did not attempt to exact, and as a matter of fact, exact a reduction in the percentage rentals that they are to pay to you?

"*A*. That is correct.

*"Q.* So that that is yet another condition to their consent, is it not?

*"A.* That's right.

*"Q.* Do you recall the type of consent the Lerner Store gave you?

*"A.* Qualified.

*"Q.* Qualified in a way that reduced the rent, did it not?

*"A.* Didn't reduce the rent. It reduced the percentage rental.

*"Q.* Would that not have the potential effect of reducing the rent?

*"A.* Yes. If they do volume it will reduce somewhat, yes.

*"Q.* I believe you indicated that it was your belief in event Turn-Style Store came in it would, in fact, increase the volume of all the other tenants.

*"A.* That's what we are gambling on, including S. S. Kresge.

*"Q.* Assuming that that gamble turns out to be correct, you then agreed with Lerner that the percentage rentals could be reduced in the future from that that was contained in their lease?

*"A.* The percentage rent factor, the factor not the percentage rent dollars. There is a great difference.

*"Q.* Did you change the percentage rent or did you change the base?

*"A.* The percentage rent factor.

*"Q.* Perhaps we are playing with words, Mr. Doyle. Would it not be fair to say that what they exacted from you in event their business increased was a reduction in total rent they might have to pay to you?

*"A.* Depending on their volume. This is the key. They could pay me a lot more rent if they did some volume, than they are paying us now.

"*Q.* You agree with me, however, that those were conditions that those particular tenants attached to their consent?

"*A.* Of course."

Considerable correspondence and meetings between representatives of Rogers Plaza, Inc., and Connecticut Mutual with Kresge took place seeking Kresge's consent to the adding of the Turn-Style store to the mall. Kresge consistently refused consent. There are conflicting positions by the contesting parties as to the reason for the refusal. It appears that Kresge advanced five reasons as follows:

(1) The proposed expansion according to the plot plans was to be limited to 50,000 square feet of ground level with a possible second story or basement.

(2) The use of the additional 50,000 square feet of land would diminish the parking space available for the plaza.

(3) The Turn-Style operation would not best serve the purpose of attracting the most patrons for cross traffic to help the other tenants.[1]

---

[1] Mr. Howard L. Green, witness for the defendant, testified in part as follows:

"*Q.* The phrase 'dumbbell' in describing shopping centers has been used in this trial, Mr. Green. Would you define or indicate what that phrase means to you, and please relate that if possible to Rogers Plaza in particular?

"*A.* A dumbbell shaped shopping center really is an elongated mall of this sort, or an elongated strip which has a major tenant on either end.

"*Q.* And do you have an opinion, Mr. Green, as to whether the advent or the construction of the Turn-Style Store, as proposed here, would properly fit within the concept of a dumbbell, so far as describing plat plans are concerned?

"*A.* In the narrow context of a plat plan, I would have to say that the Turn-Style unit would fit into a dumbbell concept.

"*Q.* And in a broader sense, how would you regard possible construction of a Turn-Style store such as proposed here in particularly Rogers Plaza?

"*A.* I have to, if I may take a moment to discuss the function of a regional shopping center, and then go into the two key tenants

(4) Turn-Style deals mainly with the same goods sold by Kresge except that they have a greater depth in merchandise.

(5) The use of the additional 50,000 square feet of ground space for Turn-Style violates the lease provision as to the ratio of square feet of parking to the square feet of buildings in the plaza.

On January 7, 1970, Connecticut Mutual entered into a lease with Jewel for 20 years plus options for renewals covering the subject land and proposed building to be constructed in the mall. This lease

---

and how they represent or do not represent appropriate tenants for a regional shopping center. In the concept of a regional shopping center, there are major tenants who hopefully generate the majority of the traffic in that shopping center, traffic from which smaller tenants, either in a strip or a mall, by the creation of that traffic, are able to generate a certain specific volume simply because people will want to cross-shop, using the terminology of the shopping center industry; that they would shop from one or the other of the major tenants and also shop the minor or mall tenants. The question with regard to the amount of cross-shopping generated is the key issue, because this is what the smaller tenants pay for when they pay rent, they pay for that traffic which is generated.

"Now, a traditional department store, one which sells more fashion merchandise, more fashion apparel merchandise provides a shopping opportunity for the customer.

"*Q.* Would you be able to indicate here in Grand Rapids some stores that would fit that particular category?

"*A.* Yes. Of course, Wurzburg's, Herpolsheimer's, Steketee's, would be, I think, the three key ones that I would recommend as representing the image of the traditional department store.

"*Q.* Fine. Please go ahead.

"*A.* The mail order department stores, because they are less oriented to apparel and fashion shopping—and by mail order department stores I am talking about Sears, Penney's, and Montgomery Ward—create something less of a desirable cross-shopping opportunity. Of course, the woman in the shopping center doesn't tend to go from store to store, let's say looking for a dress and therefore generate the mall traffic.

"Finally, the third type of store, whether we want to call it a discount department store or family center kind of department store, would in my estimation draw the least amount of cross-traffic because they do not deal in fashion merchandise. The mall tenant does not get the benefit of that traffic because the customer goes for the purposes of convenience into a family center and does not shop around.

"*Q.* And do you regard Turn-Style as being within that last category of discount or family center stores?

"*A.* Yes."

was subject to the consents being obtained and the construction of the building ready for occupancy at a time certain. The second amendment to the lease provided for Connecticut Mutual to commence a declaratory judgment action on April 20, 1970, against defendant if its consent had not been obtained by that time. The third amendment provided for cancellation of the lease by Jewel if the consent or a favorable judgment had not been obtained by July 15 or August 15 at the option of Jewel. On April 1, 1970, by letter, Kresge gave notice of its intent to take legal action to prevent this expansion in words as follows:

"April 1, 1970
"Rogers Plaza, Inc.
1110 Rogers Plaza
Wyoming, Michigan   49509
      "Re: Rogers Plaza—Kresge Store #477
              Lease entered into 7–22–59

"Gentlemen:
We are advised by Mr. Jack M. Bowie, representing Connecticut Mutual Life Insurance Company, that an addition to subject shopping center is to be commenced April 1, 1970. We are advised the addition comprises One Hundred Thousand (100,000) square feet of additional ground floor structure to be located at the east end of the existing mall as depicted on Jensen and Jensen site plan dated March 23, 1970.

"You are respectfully advised we deem the above described enlargement to be in violation of the terms and conditions of our lease and that if construction is commenced, we expect to take whatever legal action is necessary in the premises.

              "Yours very truly,
              S. S. KRESGE COMPANY
              By s/ _____
                  C. M. Booker, Vice President"

The plaintiffs' complaint was filed May 7, 1970. Pre-trial was held May 28, 1970, and the cause was advanced for hearing because of the exigencies present. The case was tried June 29 and 30 and July 1. An opinion was rendered July 16, and judgment filed July 23, 1970.

It is undisputed in the record that the parking to building ratio of 4 to 1 and the amended ratio of 2.7 to 1 were not possible of performance. How the parties computing these ratios could be so wrong twice is difficult to understand. The plot plan, with measurements, was accurate. Both plaintiffs and defendant could have ascertained the correct ratio according to the plot plan—plaintiffs' predecessors tried and failed and we are not informed as to whether defendant made any efforts in this regard. Defendant claimed that if the expansion for Turn-Style had been as understood by the parties from the inception of the lease, *i.e.,* 50,000 square feet of ground floor space and 50,000 square feet of either basement or second floor space, the ratio would then have been 2.32 to 1. With this contention we must agree.

The learned trial judge concluded in his written opinion as follows:

"1. That the ratio of two and seven-tenths (2.7) square feet of parking to one (1) square foot of gross building area is inoperative and of no effect, being an impossible ratio borne of mutual mistake by the parties and contrary to the intent of the parties.

"2. That the provisions of the defendant's lease (Exhibit B) Exhibit No. 1, as amended, does not prohibit plaintiffs from further development of Rogers Plaza Shopping Center by the addition of a building occupying 100,000 square feet of ground space.

"3. The court further declares that since the ratio figures supplied before and at the time of the trial are inconsistent and vague and undetermined with any degree of certainty, and since the total number of parking spaces can be ascertained, plaintiffs must maintain parking facilities which will accommodate at least 2,700 parked automobiles.

"4. That the defendant, its agents and employees, are permanently enjoined from in any way, directly or indirectly, interfering with plaintiffs from going forward on the further development of Rogers Plaza Shopping Center by the inclusion of a department store occupying 100,000 square feet of ground space.

"5. That plaintiffs' argument *re* the acquisition of 50,000 additional square feet of land space for parking is a valid proposition to assure adequate parking in the future. Said additional property should be held in reserve pending its need to assure at least the 2,700 parking spaces referred to above (paragraph 3) shall be available.[2]

"6. In summation that the finding of mutual mistake as to a fixed ratio of automobiles to occupied building area and the impossibility of performance as per plat plans.

"The court grants defendant's motion to dismiss plaintiffs' claim of waiver and estoppel.

"This being an equitable proceeding, the court does not find any proven damages as alleged in plaintiffs' complaint and therefore does not award any damages without further proofs. Costs of this action, plus reasonable attorney fees are awarded to the plaintiffs."

The defendant did not request a stay of proceedings pending its appeal to this Court. Connecticut

---

[2] This land adjacent to the plaza but not a part thereof was purchased by plaintiffs to supply parking to take the place of the extra parking area taken up by the Turn-Style building. The evidence indicated this land was undesirable when compared to the parking area of the plaza.

Mutual promptly proceeded to construct the Turn-Style building. At the time of oral argument in this Court, we were informed that the building was nearly completed.

On this appeal defendant raises several issues which we restate as follows:

(1) Did the trial court commit error in not requiring plaintiffs to comply with the parking area to building area ratio of 2.7 to 1?

(2) Did the trial court commit error in permitting plaintiffs to disregard the specific and relevant language in the lease and plot plans limiting future expansion to 50,000 square feet on ground level and in permitting plaintiffs to expand the mall by using 100,000 square feet of ground level?

(3) Does plaintiffs' construction of the Turn-Style building on 100,000 square feet of land area constitute a breach of defendant's lease?

# I

The original lease was on a form furnished by Kresge and the 4.0 to 1 ratio was inserted by Kresge and agreed to by Pioneer. The amendment changing the ratio to 2.7 to 1 was at Pioneer's request and was its ratio which was agreed to by Kresge. It is undisputed that both ratios were impossible of performance. Pioneer's mistake in making the ratio 2.7 to 1 is difficult to understand. However, there is no evidence that it was made in bad faith and, evidently, Kresge likewise determined it to be a proper ratio. At the time neither party knew it was impossible of performance.

In dealing with a question of impossibility of performance, our Court in the case of *Bissell* v. *L. W. Edison Company* (1967), 9 Mich App 276, sought light on the subject in 84 ALR2d 12, § 5.

Under these circumstances, we likewise turn to the same source and find on pages 31, 32:

"Impossibility of performance may be classified as original impossibility or supervening impossibility. The former is impossibility of performance existing when the contract was entered into, so that the contract was to do something which from the outset was impossible; whereas supervening impossibility is that which develops some time after the inception of the contract.

"A treatise states that where performance is impossible because of facts existing when the promise is made, the promise is void unless the risk of its impossibility is assumed, as where the parties know that performance may be impossible and base their contract upon this assumption. Where the impossibility of performance is known to both parties at the time of making the agreement, the promise is not binding. However, nonperformance of a promise is not excused because of impossibility where it is impossible because of facts which the promisor alone knew when he made the contract. 12 Am Jur, Contracts § 363.

"Williston comments that existing impossibility known to one party and not to the other would probably render the transaction voidable for fraud. He further states that if unknown to both parties there is little occasion to distinguish existing impossibility from supervening impossibility. 6 Williston, Contracts (Rev ed) § 1933.

"With respect to original or existing impossibility, the pertinent rule of the Restatement of Contracts provides as follows: '456. Existing Impossibility. Except as stated in § 455, or where a contrary intention is manifested, a promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promisor neither knows nor has reason to know.' "

As in *Bissell, supra,* we find further guidance on the law of impossibility of performance in a case where there is partial impossibility, as is present in the instant case, by turning to 6 Williston, Contracts (Rev ed), § 1956 where, on pp 5487, 5488, the authors state as follows:

"In an instructive opinion in a lower court in New York, while using the prevailing terminology of implied conditions, Rodenbeck, J., recognized that 'these terms are implied in the contract by force of the law itself, and not because the parties had them in mind. Whether we approve of their insertion upon the theory that had the attention of the parties been called to the conditions giving rise to the application of the rule, they would have omitted any reference to them because obviously covered by the law, or upon the theory that they would have regarded them as just provisions to have inserted.'

"Since the qualification of the literal terms of the promise is imposed by the law, on principles of justice, not because of the expressed intention of the parties, the extent of the qualification depends merely on what is just. 'The conditions that rendered performance impossible do not terminate the contract *ab initio,* and vitiate what has been done and what remains to be done that is capable of execution. The conditions may be of such an extent as to amount to a substantial abrogation of the entire contract, or they may relate to an insignificant part of the contract, but they excuse performance only to the extent to which performance is impossible, and leave what has been done valid permitting a recovery therefor, and may not excuse performance of the remaining work. No general rule can be laid down which will apply to all cases, but each case must be decided upon its own facts, and that this course can be taken and justice done according to the facts in each case unhampered by written rules is due to

the great flexibility of the common law which is its chief merit.' "

Under the facts in the present case, we conclude that partial impossibility of performance[3] was present and plaintiffs were properly excused by the trial court from performing that part of the lease contract.

## II

The defendant asserts error in the trial court's ruling that the lease and plot plans did not prevent plaintiffs from utilizing 100,000 square feet of land area for the Turn-Style building. It appears that the trial judge in making this ruling relied mainly on two premises: (1) the interpretation of the word "substantially" as used in paragraph nine of the original lease:

"Said Parking Facilities including necessary sidewalks and driveways shall be for the free parking of automobiles of invitees of tenants of the Commercial Development and shall be located and arranged substantially as shown on Exhibit 'B',"

and, (2) the interpretation of the effect of the letter from Mr. Britigan to Kresge written for the purpose of obtaining an amendment to the lease changing the ratio of parking area to buildings from 4.0:1 to 2.7:1, and the conclusion that Kresge by signing the amended lease agreed to the terms of the letter, *i.e.,* that the expansion was limited only to a minimum ground space of 50,000 square feet and did not limit the maximum.

As to premise (1), "substantially" is defined in Webster's Third New International Dictionary as "in a substantial manner: so as to be substantial".

---

[3] Parking space to building space ratio of 2.7 to 1.

"Substantial" is defined as "consisting of, relating to, sharing the nature of, or constituting substance * * * ". In 17A CJS, Contracts, § 508, p 814, "substantial performance" is defined:

"Substantial performance means not doing the exact thing promised, but doing something else that is just as good, or good enough for both obligor and obligee. It requires a good-faith attempt to perform without intentional or material departures."

The lease required plaintiffs to substantially maintain the parking area set forth in the plot plans. The only encroachment for future development purposes of the parking area to the east is a space outlined by dotted lines of an area 250 feet by 200 feet. The evidence clearly shows that up to the time of Jewel's demand for a building of 100,000 square feet on the ground level, there was only the intention by plaintiffs and Pioneer, the prior owner, to expand the mall to the east by a two-story department store using only 50,000 square feet of land area.

The plot plans are an integral part of the lease and are vital to controlling the proper development of the Plaza.[4] Considering the definitions of "substantially" as stated here, we cannot agree that utilizing *twice as much* land for the Turn-Style building as reserved in the plot plan for future expansion at the east end of the mall constitutes a substantial compliance with the lease. *Hempstead Turnpike Corp.* v. *Tracco Hempstead, Inc.* (1958), 14 Misc 2d 554 (177 NYS2d 778). In fact, it reduces the space reserved for parking by 50,000 square feet which is sufficient land to park from 250 to 300 automobiles.

---

[4] *The Fair* v. *Evergreen Park Shopping Plaza* (1954), 4 Ill App 2d 454 (124 NE2d 649).

As to premise (2), based upon the interpretation of the language of the letter from Mr. Britigan, Executive Vice President of Pioneer, to Kresge dated June 28, 1961, for the purpose of obtaining Kresge's permission to amend the ratio of parking to buildings from 4.0:1 to 2.7:1, wherein it is stated as follows:

"We have also always planned on a potential addition of a high grade department store requiring a minimum of 50,000 square feet of ground floor area, and possibly 100,000 square feet of gross building area. Such an addition would reduce the ratio of gross building area to parking area to 2.679 to 1."

The trial judge interpreted the words "requiring a minimum of 50,000 square feet of ground floor area, and possibly 100,000 square feet of gross building area" to mean that the use of the word "minimum" meant that there was a maximum, and that by signing the amendment to the lease, Kresge agreed that the *minimum* and not the *maximum* was 50,000 square feet of ground floor space for future expansion.

This letter can be read consistent with Kresge's position, *i.e.,* that it merely stated a desire to get a tenant for the east end of the mall with at least 50,000 square feet of building area and possibly a second floor or basement of the same size which would total 100,000 square feet. In any event, the statement in the letter alone, no matter how we interpret it, did not change the written terms of the contract, for it was a unilateral statement and the letter was not signed by Kresge.

We conclude that the lease and plot plan did not permit the plaintiffs to utilize double the amount of land reserved for future expansion in satisfying

Jewel's requirements for a building of 100,000 square feet on the ground level.

## III

Counsel for defendant at the oral argument stated in part as follows:

"It is our opinion that there has been a breach of the lease between the parties, that the lower court was called upon to declare the rights of the parties and interpret the lease. We are seeking a remand with a decision that the plans violate the lease and we would be frank to admit that unfortunately, considering the promptness with which they proceeded on construction that there would be little likelihood that any court would order that this building be razed or altered inasmuch as that might be impossible other than at a substantial cost. The rights of my client in that the lease has been violated as the pretrial order of the court indicated and the question of damages to my client was to be reserved and was not tried at the lower court level. We feel that there has been a breach of our lease, that it should be remanded and there should be a determination of damages to my client based upon an obvious and relatively quick continuing breach of the lease.  *  *  *  Kresge agreed that that building could be built on two levels with 50,000 feet, one on top of another, but would not consent to an additional loss of 50,000 square feet ground level which could be used for parking now or even as late as 1990 when the lease and further options to be renewed might occur."

In view of our ruling on issue II above, it follows that we must also rule that the construction of the 100,000 square foot building by Connecticut Mutual for Turn-Style constituted a breach of defendant's lease. We further agree with counsel for defendant that there is little likelihood that any court would

order that this building be razed or altered and this Court declines to so order.

Inasmuch as we conclude that the lease has been violated and breached, it is necessary to require that the matter be remanded to the trial court for a determination of damages.

Affirmed in part and reversed in part and remanded to the trial court for further proceedings not inconsistent with this opinion.

Costs to defendant.

All concurred.