**SNYDER'S DRUG STORES, INC., Appellant,**

v.

**SHEEHY PROPERTIES, INC., Respondent.**

**Nos. 47498, 47567.**

Supreme Court of Minnesota.

May 26, 1978.

Gray, Plant, Mooty, Mooty & Bennett and Michael B. Cunningham, Minneapolis, for appellant; Richard C. Johnson, Hopkins, of counsel.

Franke, Riach & Franke, St. Paul, for respondent.

PER CURIAM.

Plaintiff, Snyder's Drug Stores, Inc. (Snyder's), appeals from a declaratory judgment of the district court determining that the proposed construction of a restaurant by defendant, Sheehy Properties, Inc. (Sheehy), does not violate certain provisions of a lease agreement between the parties. We affirm.

The facts are not disputed. On January 20, 1970, Snyder's and Sheehy entered into a lease agreement wherein Sheehy, as lessor, agreed to lease a store unit to Snyder's, as lessee, at the Mendota Plaza Shopping Center in Mendota Heights, Minnesota. The lease agreement provides for an initial term of 20 years from the date of occupancy, with three renewal options for periods of 5 years each. Snyder's commenced occupancy of the leased premises in February 1971.

The issues presented at trial and on appeal concern provisions of the lease agreement which restrict the use of other premises located at the shopping center for the sale or consumption of food, limit the use of common areas at the shopping center, and regulate changes in the shopping center parking-lot layout or traffic-flow pattern. The provisions of the lease agreement restricting the use of other premises at the shopping center for the sale or consumption of food are set forth in paragraph 39 of the lease agreement and paragraph 2 of a rider attached to the lease agreement. Paragraph 39 reads in relevant part as follows:

"39. Except for the demised premises [Snyder's store], no part of the premises described in [the lease agreement] shall be used in any manner for the sale of food products for consumption on the premises or the sale of drugs or medicines, including patent, proprietary or common household remedies, during the term of this Lease and any extensions thereof. Said restriction shall apply especially, but not exclusively, to drug stores, pharmacies, apothecaries, restaurants, cafes, coffee shops and fountains."

Paragraph 2 of the rider further provides:

"2. Paragraph 39 to the contrary notwithstanding, the restriction as to restaurants shall only apply to the type of restaurant operated by [Snyder's] in the demised premises."

The common-area and parking-lot provisions are contained in paragraph 19 of the lease agreement, which reads in relevant part as follows:

"19. The term 'common areas' as used herein shall mean all of the premises described in [the lease agreement] except those parts thereof upon which the store units and buildings are situated and shall include all sidewalks, pedestrian walkways, streets, malls, parking areas, service areas, driveways, common use areas

and related improvements and public facilities constructed on the premises described in [the lease agreement]. The common areas shall be for the private and exclusive use of the tenants occupying said store units and buildings and such tenants' customers and invitees for driveway, servicing, walkway, parking and convenience purposes. The public shall have no rights in or to the common areas.

" * * * Neither the parking layout, nor the traffic flow pattern, nor the entrances and exits shall be changed without the written consent of [Snyder's]."

In accordance with the lease agreement, Snyder's installed a restaurant facility in its drugstore at the Mendota Plaza Shopping Center. The restaurant offers a variety of foods for sale in a 4-page menu containing separate sections for breakfasts, lunches and dinners, and fountain items. The foods are cooked to order and are served for consumption on the premises via conventional waitress service.

Sheehy subsequently entered into negotiations contemplating the construction and operation of a McDonald's restaurant at the shopping center. The proposed location of this restaurant is subject to the lease provisions described above. McDonald's is the prototype of the fast-food industry which serves a limited variety of foods which are all precooked and prepackaged. Concerning the common-area and parking-lot provisions described above, the proposed location includes a 10-foot strip of the existing parking lot. Traffic travelling to and from McDonald's would use the existing entrances and exits to the shopping center and would traverse the existing parking-lot layout. Because of the proposed construction, the parking lot would require certain modifications, some of which have been implemented pursuant to the request of the Mendota Heights City Council.

Snyder's instituted this action for declaratory and injunctive relief, seeking a declaration that the proposed construction of a McDonald's restaurant violates the terms of the lease agreement and a permanent in-junction enjoining Sheehy from planning and constructing the restaurant at the shopping center. The district court, sitting without a jury, found differences between McDonald's and Snyder's restaurants with respect to their menus, food preparation, and service and concluded that the proposed McDonald's is not the same "type" of restaurant as that operated by Snyder's. The district court also found that, except to increase the amount of parking space available, the proposed construction would not violate the lease provisions governing common-area rights or parking-lot changes. In its conclusions of law, the district court determined that the construction of a McDonald's restaurant would not violate the lease agreement, denied Snyder's request for injunctive relief, and entered judgment accordingly. Snyder's appeals from the judgment.

The issues on appeal are (1) whether the proposed McDonald's restaurant is the same "type" of restaurant as that operated by Snyder's within the meaning of the lease agreement; and (2) whether the proposed construction of a McDonald's restaurant violates the lease provisions governing the use of common areas. We answer both questions in the negative and hold that the district court's findings were not clearly erroneous.

██ 1. The question of whether the two restaurants are of the same "type" depends on the interpretation given the covenant against competition contained in the lease agreement. In interpreting the restrictive covenant, we are guided by the following general principles. First, leases should be interpreted no differently than other writings; that is, leases should be construed so as to give effect to the intention of the parties. The process of construction involves consideration of the subject matter, the objects and purposes to be accomplished, the surrounding circumstances, and the meaning of the language used in the lease. *Orme v. Atlas Gas and Oil Co.*, 217 Minn. 27, 30, 13 N.W.2d 757, 760 (1944). Great weight should be given to the intention of the parties regarding the purpose of the restrictive covenant.

Second, the underlying purpose of such restrictive covenants contained in lease agreements is to protect the lessee from competition. See, e. g., *Baron v. Crossroads Center of Iowa, Inc.*, 165 N.W.2d 745 (Iowa 1969). The degree or extent of protection conferred is normally determined by the language employed. See, generally, Annotation, 97 A.L.R.2d 4. A final, perhaps competing, consideration is that public policy dictates that restrictive covenants, being restraints of trade be strictly construed. See, *Naftalin v. John Wood Company*, 263 Minn. 135, 116 N.W.2d 91 (1962). See, also, *Winter Park Appliance Center, Inc. v. Walling Crate Co.*, 196 So.2d 198 (Fla.App.1967); *Great Atlantic & Pacific Tea Co. v. Bailey*, 421 Pa. 540, 220 A.2d 1 (1966). In sum, while covenants against competition should be strictly construed so as to give effect to the intention of the parties, such covenants should not be extended beyond their true intent. With these thoughts in mind, we turn to the language used in the covenant.

Paragraph 39 of the lease agreement prohibits the leasing of any other part of the shopping center premises for "the sale of food products for consumption on the premises." The restriction applies "especially, but not exclusively, to * * * restaurants, cafes, coffee shops and fountains." Standing alone, this paragraph is a broadly worded covenant against competition which would be entitled to a broad construction limited only by the public policy constraints set forth above. The lease as executed, however, contains a rider modifying the covenant and making the restriction applicable only to restaurants of the "type" operated by Snyder's. By adding this rider restricting the application of an otherwise broadly worded covenant, the parties exhibited an intent to narrow the degree of protection conferred by the covenant. To give effect to this intent, we will construe narrowly the restrictive covenant before us.

Unfortunately, the language employed in the modification is sufficiently ambiguous so as to be of little help in determining whether use of the shopping center premises for a McDonald's restaurant violates the covenant.[1] The operative word of the covenant, "type," is defined as "qualities common to a number of individuals that serve to distinguish them as an identifiable class or kind." Webster's Third New International Dictionary (1976) p. 2476. "Type" also suggests "strong and clearly marked similarities throughout the items included, so that each is typical of the group." Id. The ambiguity is typified by the parties' application of the language to the facts in this case.

Each party ostensibly relies on the same generic characteristics in support of their respective positions. Snyder's, painting with a broad brush, argues that the products offered by each restaurant are from the same general categories, namely breakfasts, sandwiches, and beverages. Sheehy, using significantly fewer bristles, emphasizes the variety of products within each category offered by Snyder's and argues that the products sold by Snyder's and McDonald's are dissimilar.[2] The same dichoto-

1. No contention is made that McDonald's is not a "restaurant" within the prohibition of the covenant.

2. A comparison of the 20 most popular items on the Snyder's menu with the 20 items offered by the McDonald's menu reveals the following:

| Snyder's Top 20 | McDonald's Top 20 |
| --- | --- |
| 1. Eggs, hashbrowns, etc. (breakfast special) | French fries |
| 2. Eggs, hashbrowns, etc. (breakfast special) | Coke, root beer, orange |
| 3. Plain doughnuts | Onion rings |
| 4. Ice cream cones | Hamburger |
| 5. Shakes and malts | Cheeseburger |
| 6. Supreme burger | Shakes |
| 7. Eggs and toast | Quarter pounder with cheese |
| 8. Toast | Big Mac |
| 9. French fries | Fillet of fish |

my in the parties' interpretation of the word "type" can be illustrated by the parties' arguments concerning food preparation: Snyder's contends that both restaurants are fast-food operations, while Sheehy argues that Snyder's food is cooked to order while McDonald's food is precooked. To the same effect is each party's characterization of the two restaurants' amenities, clientele, and the economic need which is satisfied.

The parties' arguments apparently were influenced in part by approaches taken by courts in other jurisdictions which have construed restrictive covenants prohibiting the lessor from leasing other premises to a same or similar business as that operated by the lessee. Those courts, whose decisions are collected in an exhaustive annotation, have considered whether the two businesses handle the same product or the same type of product, whether the two businesses offer the same kind of services, or whether the two businesses, although selling the same kind of goods, sell such goods for the same purpose or in fulfillment of the same economic demand. A further consideration, not dispositive in and of itself, is the degree of overlap in sales between the two businesses. See, generally, Annotation, 97 A.L.R.2d §§ 12 to 16. We are unable to glean from those decisions and others any talismanic test that will aid us here. Rather

each court, in examining the language of the particular covenant and the facts before it, attempts to give effect to the parties' intent by applying the same guidelines we referred to earlier.

Having thus established that public policy requires that restrictive covenants be strictly construed and not be extended beyond the true intent of the parties and that a narrow construction here will best give effect to that intent, we conclude that the trial court's findings are not clearly erroneous. *In re Trust Known as Great Northern Iron Ore Properties*, 308 Minn. 221, 243 N.W.2d 302 (1976). The menus of the respective restaurants are substantially different. McDonald's menu is limited to 20 items, while Snyder's menu offers a wide variety of breakfasts, sandwiches, meals, beverages, and desserts. Snyder's, pointing to identical items contained in each menu, argues that the menus are substantially similar. It is true that some of the food products offered by the respective restaurants overlap and, to that extent, common sense would indicate that some competition exists.[3] The fact that some competition exists, however, is not dispositive. Cf. *Rialto Luncheonette, Inc. v. 1481 Broadway Corp.*, 170 Misc. 754, 11 N.Y.S.2d 39 (1939). The trial court's findings that the method of food preparation and service at the two

| Snyder's Top 20 | McDonald's Top 20 |
|---|---|
| 10. Sweet rolls | Quarter pounder |
| 11. King burger | Milk |
| 12. French toast, bacon, etc. (breakfast special) | Coffee |
| 13. Fish sandwich | McFeast |
| 14. Beef sandwich | Apple pie |
| 15. Frosted doughnuts | Egg McMuffin |
| 16. Pancakes | Orange juice |
| 17. Pancakes, bacon, etc. (breakfast special) | Scrambled egg and sausage |
| 18. Hamburger | Cookies |
| 19. English muffins | Hot chocolate |
| 20. Tuna salad sandwich | Hot cakes and sausage |

3. Snyder's introduced evidence indicating that the opening of a McDonald's restaurant next door to one of its restaurant facilities in downtown St. Paul had an adverse effect on restaurant sales. Prior to the McDonald's opening, sales at the Snyder's facility enjoyed an increase of over 14 percent per month over the previous year. After the opening, however, sales for the next 3 months declined 28 percent, 21 percent, and 16 percent respectively.

restaurants are substantially different is supported by the evidence. McDonald's foods are all precooked, while Snyder's foods are cooked to order. With respect to services, the evidence shows that McDonald's foods are dispensed over the counter by clerks, while Snyder's foods are served primarily by waitresses.

Snyder's argues that the dissimilarities found by the trial court are merely differences in degree, not in kind. Given the language of the restrictive covenant, we are unable to agree. The language of the restrictive covenant applies to restaurants of the same "type" as that operated by Snyder's. If that language is to have any meaning at all, it must refer to restaurants whose menus, food preparation and service are substantially similar. The evidence on this point clearly establishes that the proposed McDonald's restaurant is not similar. Were we to apply the logic of Snyder's argument, the restrictive covenant would prohibit Sheehy from leasing any other part of the shopping center premises to almost any restaurant. Had such a result been intended, the rider limiting the scope of the restrictive covenant would not have been added to the lease agreement. The trial court's finding that the proposed McDonald's restaurant is not the same "type" as Snyder's restaurant is not clearly erroneous.

■ 2. The question whether the proposed construction violates the lease provisions governing the common areas is more troublesome. Snyder's advances two arguments premised on Sheehy's concession that the proposed location is within the common area as defined in the lease agreement. Snyder's first contention is that the language of the lease agreement prohibits the construction of the proposed McDonald's restaurant without the consent of the present shopping center tenants. We are unable to agree with this interpretation.

The language of the lease provision governing the common areas provides in part that the common areas, which include the parking lot, are for the private and exclusive use of the tenants of the shopping center and their customers and invitees for "driveway, servicing, walkway, parking and convenience purposes." The public is denied rights in or to the common areas. The provision prohibits changes to the parking-lot layout, traffic-flow pattern, or entrances and exits to the shopping center without the tenants' permission. The provision also obligates Sheehy to maintain the common areas and obligates Snyder's to pay its proportional share of such maintenance. The unmistakable impression is that the parties intended by these provisions to guarantee adequate parking and easy accessibility to the common area for the tenants and their customers. We are unable to discern from the language of the covenant any intent to confer a "veto" power on the present shopping center tenants over future development of the shopping center. Snyder's has referred us to several authorities where certain lease provisions have been given a "veto" effect. See, e. g., *Rogers Plaza, Inc. v. S. S. Kresge Co.*, 32 Mich.App. 724, 189 N.W.2d 346 (1971); *Gray Drug Stores, Inc. v. Foto Fair International, Inc.*, 32 Ohio App.2d 71, 288 N.E.2d 341 (1971); *W. T. Grant Co. v. Indian Trail Trading Post, Inc.*, 423 S.W.2d 251 (Ky.1967). The lease provisions construed in those decisions, however, contained express language governing existing tenants' rights in the face of proposed future development of the shopping center. In the absence of such express language, we are reluctant to give the provision governing the common areas such an effect.

Snyder's also argues that the trial court's findings are clearly erroneous because the proposed construction contemplates use of some of the existing parking area. We do not agree. The location of the proposed McDonald's restaurant will be in an area that was not developed under the provisions of the lease agreement. The only developed area that will be infringed upon is a 10-foot strip on the outer edge of the parking lot. Further, modifications to the parking area, made at the request of the Mendota Heights City Council, eliminate approximately 10 parking spaces and relate only to

traffic control. None of these modifications to the parking area require Snyder's consent. The existing parking-lot layout and traffic-flow pattern will remain the same, and no new entrances or exits to the shopping center are planned.[4] It is clear that the infringement contemplated by the proposed development is insubstantial and that the purposes and use of the common areas will not be significantly affected. The trial court's findings to that effect are not clearly erroneous.

The judgment of the trial court is affirmed.

OTIS, J., took no part in the consideration or decision of this case.

---

**4.** Snyder's argues that traffic-flow pattern includes volume and that the proposed addition of a McDonald's restaurant will increase significantly the volume of traffic using the shopping center. Were the language only "traffic flow," Snyder's argument would have considerable merit. Traffic-flow pattern, however, quite clearly refers to the path of vehicular travel, not the number of vehicles using that path.