RANGE *v.* DAVISON.

1. VENDOR AND PURCHASER—LAND CONTRACT MAY NOT BE ALTERED TO AN OPTION BY REFERRING TO IT AS SUCH.

> A written instrument, which by its character and terms constituted a land contract, could not be altered to be an option by reason of the fact that the parties afterwards erroneously referred to it as such.

2. SAME — PARTIES NOT RELEASED BY PAROL UNLESS CONTRACT TERMINATED BY OPERATION OF LAW.

> Unless a land contract is surrendered by operation of law, the parties thereto may not be released by parol.

3. SAME—LAND CONTRACT DISTINGUISHED FROM OPTION.

> The test distinguishing an option from a land contract is that in the latter the seller is obligated to sell and the purchaser to buy; both parties being bound.

4. SAME.

> An instrument in which the sellers and the purchaser are named as such, the property is legally described, the price, time, and terms of payment are stated, and which is signed by both parties, is a land contract rather than an option merely.

[1]Vendor and Purchaser, 39 Cyc. p. 1297; [2]Frauds, Statute of, 27 C. J. § 150; [3]Vendor and Purchaser, 39 Cyc. p. 1179.

5. SAME—RIGHT TO ASSIGN RECOGNIZED.

A paragraph in a land contract which stipulates that its provisions "apply to and bind the successors, heirs, executors, administrators and assigns of the respective parties," recognizes the right of the parties to assign their respective interests in the contract.

6. SAME—FORFEITURE DOES NOT FOLLOW DEFAULT IN PAYMENTS UNLESS SO PROVIDED, WHERE TIME IS NOT AS OF ESSENCE OF CONTRACT.

Where, in a land contract, time is not specified as of the essence of the contract, and it contains no provision for *ipso facto* forfeiture in case of default, bare failure to make payments when due does not terminate it.

7. SAME—TIME AS OF ESSENCE OF CONTRACT.

Naming the date when payments fall due does not in itself make time as of the essence of the contract.

8. SAME—QUIETING TITLE—SPECIFIC PERFORMANCE.

In a suit by the vendors in a land contract to quiet their title to the land conveyed on the theory that the contract was terminated, and a cross-suit by the vendee's assignee for its specific performance, evidence *held*, insufficient to establish that the contract had been terminated.

9. SPECIFIC PERFORMANCE—EQUITY—BONA FIDE PURCHASER.

The rule that specific performance of a contract for conveyance of land is discretionary with chancery courts and may be denied when, after a full consideration of the facts shown, to grant the same would be inequitable or unjust, *held*, not applicable to the facts in the instant case, which show that vendor's claim that the vendee is not a *bona fide* purchaser is not sustained.

10. VENDOR AND PURCHASER—TENDER—WAIVER.

Absolute repudiation of a land contract by the vendors and refusal to accept the offered payment constituted a complete waiver of formal legal tender.

Appeal from Oakland; Covert (Frank L.), J. Submitted June 7, 1927. (Docket No. 2.) Decided April 3, 1928.

---

[5]Vendor and Purchaser, 39 Cyc. pp. 1663, 1665; [6]Id., 39 Cyc. p. 1604; [7]Id., 39 Cyc. p. 1338; [8]Quieting Title, 32 Cyc. p. 1372; [9]Specific Performance, 36 Cyc. p. 550; 27 R. C. L. 659; [10]Vendor and Purchaser, 39 Cyc. p. 1566.

Bill by Fred Range and another against William Davison, Harry H. Simpson, and others to quiet title to land. Defendant Simpson filed a cross-bill for specific performance of a land contract. From a decree for defendants, plaintiffs appeal. Affirmed.

*J. G. Stephenson,* for plaintiffs.

*Stanton Clarke* and *John A. Sunday,* for defendant Simpson.

SHARPE, J.    Plaintiffs filed this bill for the purpose of quieting title to a 30-acre tract of land lying west of the city of Royal Oak on the Eleven Mile road in Royal Oak township, Oakland county.    All defendants except Albert Lothamer and Harry H. Simpson appear to have been disinterested and allowed the case to go by default.    Lothamer answered in explanation and denial of any interest in the property, asking dismissal of plaintiffs' bill as to him; while Simpson answered issuably, with a cross-bill asking affirmative relief by decree for specific performance of a land contract for said property running to defendant Lothamer, executed by plaintiffs and their father Joseph Range, which he claimed to have acquired.    To the latter plaintiffs duly answered in denial.

In outline, it appears from record proof or is undisputed that prior to September 17, 1924, Joseph Range, then a widower, was the owner of an undivided one-half interest in these premises, while his son, Fred Range, and his daughter, Minnie M. Baker (*nee* Range), each owned an undivided one-quarter interest in the same.    On that date, the owners, together with Alice Range, wife of Fred Range, entered into a written agreement with Lothamer for sale to him of the land in question at the agreed price of $48,750 net, with an initial payment down of $500, which he then made. Omitting the unquestioned description, it reads as follows:

"Agreement made this seventeenth day of September, 1924, between Joseph Range, a single man, Fred Range and Alice Range, his wife, and Minnie M. Baker, hereinafter described as the sellers, and Albert Lothamer, or assigns, of the city of Detroit, hereinafter described as the purchaser.

"Witnesseth, That the seller agrees to sell and convey, and the purchaser agrees to purchase all that lot of land, with the buildings and improvements thereon in the township of Royal Oak (description).

"The price is forty-eight thousand seven hundred fifty and no/100 ($48,750) dollars net, payable as follows: Five hundred and no/100 ($500) dollars on the signing of this agreement, the receipt of which is hereby acknowledged by me.

"Forty-eight thousand two hundred fifty and no/100 ($48,250) dollars in cash on the delivery of the deed as hereinafter provided; Five hundred and no/100 ($500) thirty (30) days from date. Balance sixty (60) days from date. Abstract to be delivered to first (second) party before second payment is made and to show merchantable title with all taxes and assessments paid except six hundred and no/100 ($600) balance on paving tax, which is assumed by party of the second part as well as State and county taxes for the year 1924.

"If there are any imperfections in title which can be cured by a chancery proceeding instituted for the purpose of quieting title, deal will be closed notwithstanding upon the condition that $500 is placed in escrow for that purpose.

"Abstract to be brought down to date at seller's expense.

"All deeds shall be regular full covenant warranty deeds conveying the absolute fee, subject only to incumbrances herein specified or building restrictions of record.

"Rents and interest on mortgage contract, insurance, etc., if any, are to be apportioned.

"The risk of loss or damage to said premises by fire until the closing of the deal is assumed by the seller.

"The stipulation aforesaid are to apply to and bind the successors, heirs, executors, administrators and assigns of the respective parties."

This contract was prepared by or under direction of the purchaser Lothamer and submitted to the sellers, who, accompanied by him, went to the office of their attorney, George B. Hartrick, at Royal Oak, to whom it was submitted and at whose instance certain corrections and insertions were made in the one proposed, including the paragraph relating to imperfections in title, after which it was signed in his office, he acting as one of the witnesses.

An abstract brought down to October 6, 1924, was delivered before the end of October to an attorney of Detroit named Rymal, claiming to act for Lothamer, at just what date is in dispute. He seasonably examined the same and wrote an opinion as to it directed to Lothamer, in which he pointed out certain claimed errors in description and other defects in the title, suggesting they might be cured by perfecting some incomplete probate proceedings and filing a bill to quiet title.

Lothamer failed to meet the second payment of $500 when due, and on November 12, 1924, plaintiff Fred Range, accompanied by attorney Hartrick, went to the office of the Waddell, Wilcox, Rymal Company of Detroit, an incorporated real estate company of which Rymal and Waddell were members and Lothamer then an employee. He was not present but at home ill. They had an interview with Rymal in relation to the matter, and he returned then the abstract with a copy of his opinion as to it which he had prepared for Lothamer. They asked for surrender of the contract but it was not returned.

On November 22, 1924, Joseph Range died and his estate was thereafter probated in the probate court of Oakland county. The estate was not closed until June 1, 1925. Plaintiffs, being his sole heirs, were awarded his half interest in this property.

On December 2, 1924, Lothamer and his wife quit-

claimed the interest he had acquired under the contract to David M. Waddell, of the Waddell, Wilcox, Rymal Company. The deed was recorded in the office of the register of deeds of Oakland county on December 5, 1924. Waddell met with a sudden death on December 27, 1924, survived by a widow and minor son. His home was in Ferndale, Oakland county, and his estate was probated in the probate court of that county.

On March 27, 1925, his widow, Adeline M. Waddell, gave a quitclaim deed of her own interest in the property to the Waddell, Wilcox, Rymal Company and also of the interest of their minor son, David L. Waddell, as his guardian, pursuant to an order licensing her to so do granted by the circuit court of Oakland county, followed by an order confirming the sale. On the same date the Waddell, Wilcox, Rymal Company quitclaimed the same to defendant Simpson. Of scant legal significance, but as part of the written evidence, appear indorsed on the contract involved assignments of it by Lothamer to the Waddell, Wilcox, Rymal Company and by the latter to defendant Simpson. Above each indorsement appears "3-27-25." Below them, under the date "Pontiac, Mich., Jan. 5, 1926," is a certificate of the county treasurer of Oakland county "that the amount secured by this mortgage is $48,250 and that I have received $241 in full payment for the taxes thereon." The oral evidence offered by the respective parties is quite voluminous and conflicting.

Plaintiffs first allege and particularly press as a fundamental error of the court its ruling that the instrument to which this litigation centers is a contract, and not an option. If the latter, the purchasers' failure to make the second payment within the provided time would be fatal to the defense. Urging that it can fairly be so construed as a matter of law,

plaintiffs claim that the purchasers and their attorney also so construed and accepted it, admitting inability to pay as specified, which the defense denies.

It must be conceded that Rymal's naming it an option at times when off his guard lends some color to plaintiffs' contention. While as a witness for defendant he first deprecated the suggestion that he had ever so recognized it in thought or words, when confronted with his testimony taken at the circuit court proceedings for sale of the minor's interest in the property, where he repeatedly designated it as an option, he was apparently stricken with an acute attack of amnesia, denied all remembrance of having been sworn in that matter or recognizing any of his testimony as read to him, and finally when asked, "Your mind is a blank on that proceeding?" he answered, "Certainly is, I don't remember a thing that went on, except who was there; I remember who was there." Plaintiffs also introduced some other testimony of language by Rymal and Lothamer about the time the second payment of $500 fell due tending to show they recognized it was an option and the $500 paid would be lost because subsequent payments were not met when due. Lothamer is shown to have been sick and confined to his house for several weeks in October and November, and Rymal's version of what was said is limited to admitting that the payments could not be met when due and trying to secure easier terms. When dealing with these parties Simpson had no knowledge or notice of any admission or claim that the instrument was only an option. Be that as it may, the agreement was not surrendered and the testimony is convincing that plaintiffs subsequently recognized it as outstanding against the property. In any event, the character and terms of this written instrument could not be altered by what the parties erroneously called it, nor, unless surrendered by operation of law, be released by

parol. *McEwan* v. *Ortman,* 34 Mich. 325; *Waller* v. *Lieberman,* 214 Mich. 428; *Barton* v. *Molin,* 225 Mich. 8.

Taken as it reads, the agreement is clearly a land contract, as distinguished from an option. Plainly, both parties are bound by it. The sellers are obligated to sell and the purchaser to buy, which is the recognized test. *Pangburn* v. *Sifford,* 216 Mich. 153. In this instrument the sellers and purchaser are named as such, the property is legally described, the price, time, and terms of payment are stated. It is signed by both parties, and its concluding paragraph stipulates that its provisions "apply to and bind the successors, heirs, executors, administrators and assigns of the respective parties," thus recognizing the right of the parties to assign their respective interests in the contract. Time is not specified as of the essence of the contract, it contains no provision for *ipso facto* forfeiture in case of default, and bare failure to make payments when due did not terminate it. Naming the date when payments fall due does not in itself make time of the essence of the contract. Conceding all said which plaintiffs claim, there was no consideration therefor, no physical surrender of possession of the property or of the written agreement. Under it plaintiffs were entitled to retain possession of the property until final payment.

Appealing to the rule that specific performance of a contract for conveyance of land is discretionary with chancery courts and may be denied when, after a full consideration of all the facts shown, to grant the same appears to the court inequitable or unjust, plaintiffs further contend by their brief that relief should be denied Simpson because of inequitable conduct and bad faith, charging that he is "not a *bona fide* purchaser," but an interloper and stranger to the original transaction; that he discovered "what appeared to be

a plausible legal technicality" through which he sought to turn the situation to his own advantage and "force an unconscionable sale." The trial judge, who had the advantage of hearing and seeing the parties and witnesses, with full opportunity to observe their attitude and manner of testifying, was not so impressed, but on the contrary states in his opinion:

"Plaintiffs claim that defendant Simpson is in no position now to enforce the contract and ask for specific performance thereof, because of his conduct. After listening to the testimony in the case, I am not able to find that Simpson had been guilty of misconduct. He was, it is true, anxious to buy this property at the price mentioned in the contract, and being unable to do so directly from plaintiffs, purchased the interests of Lothamer and his assignees."

The great weight of convincing evidence sustains that view of Simpson's conduct in relation to this matter. He owned some land close to this property, which he frankly admits he was anxious to buy. He had tentative negotiations for that purpose with plaintiffs and their father before they contracted it to Lothamer. He went to their place, talked with and learned from them their price, and made them an offer approximating it, which they did not accept, but in the conversation told him he would yet be given another opportunity. Later he went to their place accompanied by two real estate men to resume negotiations with the owners, and was then told by them they had already contracted to sell the property, but he could still have a chance to buy it if the contract purchasers did not come through. One of the real estate men who accompanied Simpson was seriously ill at the time of the trial and not a witness. The other, named Eaton, testified of the interview that they were told, in substance:

"Somebody had a contract on the property and that

242—Mich.—6.

they couldn't talk any terms of sale until that paper was in their possession; that they couldn't make any further deal but when they got that paper they would be glad to go through with the deal with Mr. Simpson."

Simpson thereafter kept in touch with plaintiffs, and, being reassured that he should have a chance to purchase when their title was cleared up, he suggested to Fred Range that perhaps he (Simpson) might be able to obtain the outstanding contract, and was assured they would be glad to have him do so. He then learned who was the contract purchaser and followed the matter up. He ascertained the contract had been sold and assigned by Lothamer to Waddell, located him through the city directory in the Majestic building in Detroit and negotiated for purchase of the contract. Waddell died before this deal was concluded, and it was later consummated, as before related, through the Waddell, Wilcox, Rymal Company, for which it appeared Waddell had taken the assignment, and the proceeds were later taken into consideration in settlement with his administrator for Waddell's interest in the company, the details of which are unimportant. Simpson had never met any of these parties before he found and dealt with them at arm's length in purchasing this contract for which the testimony shows he paid $1,400. He independently obtained an abstract of the property, and they reached an agreement for his purchase of the contract in January, 1925. He then told Fred Range he had secured it and they could now close their deal, to which the latter replied that, the father having died, they must probate the estate before he could do anything. Simpson thereafter kept track of both the Range and Waddell probate proceedings, and secured his title papers for purchase of the contract in March, 1925.

When the estate of Joseph Range was closed early

in June, 1925, Simpson went to see Fred Range and told him his father's estate being closed and he (Simpson) having purchased the outstanding contract, they could now conclude their deal under it; that he had the money ready and asked him where he wanted to receive it.    Fred replied he would ·not accept the money, and refused to go through with the deal.    The latter's version of this interview is that Simpson came out to their place to see him, "and said he came to buy the farm, and I said it wasn't for sale, and he said he had purchased that agreement.    I told him I did not care if he did have it.    It was of no value. He said he would bring me the money, and I told him I wouldn't take it, and then he said he would go to court with me, and I said 'All right,' I would go to court;" which he (Range) did by filing this bill on August 8, 1925.

The point is also urged for plaintiffs that no legal tender was ever made of the amount due on this contract which Simpson seeks by his cross-bill to enforce. It is undisputed that after his father's death Fred Range was the authorized spokesman for plaintiffs. His admitted absolute repudiation of the contract, and refusal to accept the offered payment constitutes a complete waiver of formal legal tender.    *Witt* v. *Dersham,* 146 Mich. 68; *Hedrick* v. *Firke,* 169 Mich. 549; *Lackovic* v. *Campbell,* 225 Mich. 1.    Simpson testified that he then had the money to make full payment on the contract available and continued to have it ready for that purpose until the day of the trial, offering to fully perform on his part.    The court took precaution to provide in its decree that the deed of the property and the amount due on the contract should be seasonably deposited with the court for delivery to the proper parties pursuant to the specific performance decreed.

The decree will stand affirmed, with costs in this court to defendant Simpson.

FELLOWS, WIEST, CLARK, and MCDONALD, JJ., concurred.

Justice STEERE and the late Justices SNOW and BIRD took no part in this decision.