**Raymond H. JENKINS, Plaintiff,**

v.

**U.S.A. FOODS, INC., a Delaware Corporation, and Amerifoods Companies, Inc., a foreign corporation, jointly and severally, Defendants.**

No. 95–CV–72152.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 18, 1996.

Marisa C. Petrella, Michael P. Fresard, Petrella & Associates, P.C., Bloomfield Hills, MI, for plaintiff.

Thomas L. Beadle, Samuel D. Sweet, Beadle & Sweet, P.C., Troy, MI, Marc S. Friedman, Friedman Siegelbaum, Roseland, NJ, for defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

### Background

Plaintiff, Raymond Jenkins ("Jenkins"), solely owned and operated Cabana Foods,

.Inc., ("Cabana"), a snack foods producer, for some twenty-nine years. He sold all outstanding Cabana stock to defendant, U.S.A. Foods ("USA"), a foreign corporation, as evidenced by a stock purchase agreement dated January 3, 1994 ("the Stock Purchase Agreement"). Co-defendant, AmeriFoods Companies, Inc. ("AmeriFoods"), also a foreign corporation, is successor in interest to USA and Cabana.

On March 4, 1994, as required by the Stock Purchase Agreement, USA executed and Jenkins approved an unsecured, nonnegotiable promissory note ("the Note"). Section 1.04(a) of the Stock Purchase Agreement provides for delivery of the purchase price of $3,350,000 "[u]pon the terms and subject to the conditions of this Agreement" as follows: $250,000, to be placed into an escrow account; $2,100,000, to be wired to Jenkins' bank account; and a $1,000,000 promissory note, made payable to Jenkins, to be executed by USA. A copy of the Note was attached to the Stock Purchase Agreement.

The Note required that the $1,000,000 principal would be paid in full no later than March 4, 1999 and that interest would be computed from March 4, 1994 at a rate of seven and one-half percent per annum on the principal balance, and paid semi-annually on the fourth day of September and March of each year, commencing September 4, 1994, and ending March 4, 1999.

The Stock Purchase Agreement provided that the following documents ("the ancillary documents" or "the ancillary agreements") would be executed on the date of the closing of the sale of stock: an indemnity escrow agreement ("the Indemnity–Escrow Agreement");[1] a non-competition agreement ("the Non–Competition Agreement");[2] and an employment agreement ("the Employment Agreement").[3] On March 4, 1994, the agree-

1. This agreement provides that claims arising out of the indemnity provisions of the Stock Purchase Agreement shall be paid from an escrow account.

2. In this agreement, Jenkins promised, among other things, not to participate in an enterprise

conducting business similar to Cabana's for a discrete period of time.

3. The Employment Agreement provided that Jenkins would continue on as President of Cabana

ments and the Note were executed and USA became the owner of the stock of Cabana. Jenkins received $2,850,000, comprised of: $2,100,000, part of the price of the stock; $500,000 for entering into the Non–Competition Agreement; and $250,000 in prepaid salary under the Employment Agreement. USA also deposited $250,000 in an escrow account pursuant to the Indemnity–Escrow Agreement, agreed to pay Jenkins an annual salary of $200,000 for five years pursuant to the terms of the Employment Agreement, and assumed $11,000,000 of Cabana debt.

The first interest payment on the Note fell due on September 4, 1994; USA tendered it within thirty days of being notified by Jenkins that it had missed the due date. The Note provides for acceptance of late payments within a thirty-day "grace period"; this payment was accepted by Jenkins.

The next interest payment was also tardy. By letter dated March 13, 1995, Jenkins notified USA of its failure to pay by March 4, 1995. USA failed to tender payment within thirty days of the notice, thus triggering paragraph 5(i) of the Note, which provides that the failure to "make any payment of interest or principal under this Note on any due date, provided such non-payment continues uncured for a period of thirty (30) days following written notice thereof" will be an "Event of Default."

Jenkins sent a letter dated April 17, 1995 to USA, declaring the full balance on the Note forthwith due and payable, pursuant to an acceleration clause [4] set forth at paragraph 5 of the Note. USA attempted to tender the interest payment of $37,500 on April 20, 1995, but such payment was refused by Jenkins. Nonetheless, USA tendered a check for the third interest payment on September 4, 1995. It was not cashed by Jenkins. Jenkins then brought this action to recover the principal balance under the Note.

## Issue

Jenkins seeks summary judgment, court-ordered specific performance, and an account stated. USA and AmeriFoods oppose that motion; they filed a joint cross-motion for partial summary judgment in their favor.[5] These motions are confined to the issue whether Jenkins is entitled to accelerate payment of the balance of the Note.

## Analysis

In this diversity case, I follow substantive Michigan law.[6] *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

### A. Scope of the Agreement Between the Parties

To determine whether Jenkins has the right to accelerate payment of the Note, Jenkins argues that I should refer only to the face of that document ("the narrow construction"). USA and AmeriFoods argue that acceleration is restricted by the terms of the Stock Purchase Agreement, of which the Note is a part, and that reference should be made to the agreement as a whole ("the broad construction").

Michigan law holds that where one writing refers to another, the two shall be construed together. *Whittlesey v. Herbrand Co.,* 217 Mich. 625, 627, 187 N.W. 279 (1922); *Culver v. Castro,* 126 Mich.App. 824, 826, 338 N.W.2d 232 (1983). The Note provides in its opening paragraph that it is "subject to the terms and conditions of a Stock Purchase Agreement dated January 3, 1994," and the Stock Purchase Agreement is replete with references to the Note and the ancillary agreements.[7] Because of this, the Stock

---

Foods or in another executive position through March 3, 1999, unless terminated for cause.

4. This clause reads as follows:
   [i]f any of the following events ('Events of Default') shall occur and be continuing ... then, [Jenkins] may ... by notice to [USA], declare the full unpaid principal balance of this Note, together with any accrued but unpaid interest, to be forthwith due and payable, whereupon such amounts shall be forthwith due and payable.

5. If defendants' motion is granted, only the counterclaim which they have filed will officially remain in this case.

6. Both the Note and the Stock Purchase Agreement specify that Michigan law governs.

7. At § 1.04 of the Stock Purchase Agreement, it is stated that the purchase price includes the Note, which is included as "Exhibit B." At § 5.08, the parties enter into an agreement to agree to the Indemnity Escrow Agreement, "in

Purchase Agreement, the Note, and the ancillary documents must be considered as one agreement. *See Culver*, 126 Mich.App. at 826, 338 N.W.2d 232.

The fact that the Note and the ancillary agreements were executed about two months after the Stock Purchase Agreement was signed and the fact that they may possess, in their own right, the attributes of a contract do not preclude finding that they were part of the stock purchase. Where the performance of a promise which constitutes consideration for a contract is a seemingly independent undertaking, the transaction may be viewed as singular. *Joy v. Pagel*, 287 Mich. 453, 455, 283 N.W. 646 (1939) (holding that a purchase and subsequent repurchase of stock constituted one transaction, where at the time of plaintiff's assignor's purchase of stock, the contemplated repurchase by defendants at a later time helped induce plaintiff's assignor to part with his money; thus, performance of the first stock transfer was considered partial performance of the whole agreement, and the statute of frauds did not bar the enforcement of defendants' promise to repurchase.) In this case, a promise to execute and deliver the Note clearly is consideration for the Stock Purchase Agreement. Analogous to *Joy v. Pagel*, the performance of this promise may not be viewed as an undertaking independent of the Stock Purchase Agreement.[8]

Of course, if the Stock Purchase Agreement explicitly specified the Note as the sole point of reference for determining the obligations described therein, then all of what has been said notwithstanding, I would be bound to honor the parties' agreement and so confine my analysis. Jenkins argues that the Stock Purchase Agreement so provides in the following portion of section 4.03(a): "[t]he Purchaser Ancillary Documents[9], when executed and delivered, will be the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms." This sentence states no more than the truism that, upon execution, USA would be bound by the terms of the legal documents which it contemplated executing. The interpretation suggested by Jenkins would apply if the Stock Purchase Agreement provided that the duties described in the ancillary documents would be the sole obligations of USA upon their execution, but this is not the case.

The language of the Stock Purchase Agreement in fact compels the result opposite to that favored by Jenkins. Section 11.07 provides that the *"Schedules, Attachments* and *Exhibits* referred to herein shall be construed with and as an integral part of this Stock Purchase Agreement to the same extent as if they were set forth verbatim herein." The Note and the other ancillary documents were attached to the Stock Purchase Agreement as Exhibits. Clearly, the Note was incorporated by reference into the Stock Purchase Agreement.

I agree with USA and AmeriFoods that the broad construction is appropriate. The Note and the other ancillary documents evidence one transaction: the sale of Jenkins' business to USA. They are properly viewed as part and parcel of the principal contract

the form of *Exhibit A*," the Non–Competition Agreement, "substantially in the form of *Exhibit C*," and the Employment Agreement, "substantially in the form of *Exhibit D*," at the time of closing. At § 7.07 and § 8.05, the execution and delivery of those agreements, "in the form of" Exhibits A, C, and D is expressly made a condition precedent to the contracting parties' obligations. Sections 11.06 and 11.07 refer to the Exhibits as part of the understanding of the parties.

8. Plaintiff seems to be under the impression that because the Note, physically separate from the Stock Purchase Agreement, was contemplated and brought into being, the two cannot be construed together. Thus, plaintiff would probably point out that a distinction between the facts of

*Joy v. Pagel* and the case presently at bar is that in the latter, but not the former, the promise at issue takes the form of an "agreement to agree." USA agreed to agree to the terms of the Note at a later date. Under Michigan law, this is a distinction without a difference, for "[a] contract to make a *subsequent contract is not per se* unenforceable; in fact, it may be just as valid as any other contract." *Opdyke Investment Co. v. Norris Grain Co.*, 413 Mich. 354, 359, 320 N.W.2d 836 (1982).

9. "Purchaser Ancillary Documents" are defined at § 11.10 of the Stock Purchase Agreement as "any agreement or instrument contemplated hereby to be executed and delivered by Purchaser." The Note falls within this definition.

for that transaction, the Stock Purchase Agreement. As such, the various agreements must be construed as one instrument. *See West Madison Investment Co. v. Fileccia,* 58 Mich.App. 100, 106, 226 N.W.2d 857 (1975).

### B. Substantial Performance

■ USA and AmeriFoods argue that USA substantially performed its obligations to Jenkins, and that Jenkins should not be allowed to accelerate the principal balance under the Note. The "substantial performance doctrine" of contract law holds that where an agreement for the exchange of performances has been made, and the first performance is rendered substantially in full, the second performance is owed; conversely, where the first performance is not substantially rendered, the second performance is excused. *See* 3A Arthur L. Corbin, Corbin on Contracts § 700 (2d ed. 1960). Defendants essentially contend that if the balance of the Note is allowed to be called in, the entire deal effectively will be aborted, for a $1,000,000 judgment against the companies would lead to a default in USA's bank debt, the possible bankruptcy of both USA and AmeriFoods, and the resultant inability to continue operating the snack foods business acquired from Jenkins. The implication of this argument is that Jenkins owes USA a duty to refrain from triggering the forfeiture of USA's and AmeriFoods' interest in Cabana. USA and AmeriFoods argue that application of the "substantial performance" doctrine, as adopted by Michigan courts, to these facts requires judgment in their favor.

Michigan law does not favor forfeiture, *Leighton v. Leighton,* 10 Mich.App. 424, 433, 159 N.W.2d 750 (1968), and this is reflected in its stance on substantial performance, which is summarized as follows:

> A contract is substantially performed when all the essentials necessary to the full accomplishment of the purposes for which the thing contracted has [sic] been performed with such approximation that a party obtains substantially what is called for by the contract.

> Generally speaking, **deviations from the absolute terms of a contract do not necessarily cause a failure of performance,** but may entitle a party to extra compensation or damages. **Imperfections in the matters of details which do not constitute a deviation from the general plan do not prevent the performance from being regarded as substantial** performance. On the other hand, where the deviations or alterations are such as would essentially change the terms of performance, they will be considered as a failure of performance.

*Gibson v. Group Insurance Co.,* 142 Mich. App. 271, 275–276, 369 N.W.2d 484 (1985) (quoting 6A Michigan Law & Practice, Contracts, § 314, (footnotes omitted)) (emphasis added).

Thus, if USA's delay in payment is deemed an "imperfection in a matter of detail," then USA has substantially performed its obligations, and Jenkins is not entitled to disregard his contractual obligations, whatever they may be.[10] *See, e.g., Leighton,* 10 Mich. App. at 434, 159 N.W.2d 750. If, however, timely payment is deemed to be "of the essence" of the parties' agreement, such that USA's tardiness is equivalent to a deviation from the "general plan," then Jenkins may be entitled to accelerate the balance of the Note.

Jenkins argues that the substantial performance doctrine should not be applied here because the contract expressly made the continued omission of payment within the thirty-day grace period a condition precedent to Jenkins' right to accelerate. Jenkins' focuses on the applicability of the doctrine to USA's implied promise[11] to tender the balance of the Note upon rightful acceleration by Jenkins. The immediate question before me, however, is whether USA substantially com-

---

10. I defer a discussion of Jenkins' contractual obligations until after discussing whether USA substantially performed.

11. I use the term "implied promise" loosely here. By it, I allude to the fact that the Note does not contain USA's express declaration that "USA promises to pay the balance on the Note when it is rightfully accelerated," but rather that promise is implied by the language that the balance "will become forthwith due and payable" when Jenkins properly accelerates.

plied with its payment obligations under the Stock Purchase Agreement and the Note. If the answer to this question is yes, then Jenkins will not be released from any of his obligations to USA, and if he has an obligation to accept the late interest payment, as defendants contend he does, he will not be allowed to accelerate; if the answer is no, then Jenkins' right to accelerate will be determined only with reference to the acceleration clause, as he will be released from his contractual obligations.

Michigan law provides that naming the date when payments fall due is not sufficient to make time the essence of a contract. *Range v. Davison,* 242 Mich. 73, 80, 218 N.W. 789 (1927). Thus, USA's failure to meet the original March 4, 1995 deadline is not a material breach. Indeed, from the fact that the Note specified that Jenkins must take affirmative steps to protest late payment by USA, and that late payment might be tendered within thirty days of Jenkins' protest, I conclude that payment by a precise deadline was not a critical element of the parties' agreement; certainly, there would be no material breach if payment had arrived within the thirty-day grace period. Where one payment arrived a couple of days after the grace period had expired, it is difficult to see a basis for finding a material breach in what was some two days earlier a mere technical breach, where the payee suffers little or no additional prejudice with the passage of a couple of days.

I am mindful that ordinarily, under Michigan jurisprudence, whether a contract has been substantially performed, or to the contrary, materially breached, is a question of fact for the trier of fact. *In re American Cas. Co.,* 851 F.2d 794, 798 (6th Cir.1988). Still, the matter may be decided on summary judgment where the factual issue is not "genuine," FED.R.CIV.P. 56(c), (e). No genuine issue of fact exists where a rational trier of fact could reach but one conclusion. *See Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1985); *see also Doyle v. Bethlehem Steel Corp.,* 504 F.2d 911, 913 (5th Cir.1974).

The facts lead me to conclude that no rational trier of fact could find that USA did not substantially perform its payment obligations to Jenkins, where Jenkins was not appreciably harmed by the payment of $37,500 worth of interest within a couple of days of the end of the grace period. *See A.E. Giroux, Inc. v. Contract Services Associates,* 99 Mich.App. 669, 670–71, 299 N.W.2d 20 (1980) (affirming summary judgment granted to defendant who was one day late on a payment; where no material damage to plaintiff, the delay was *de minimis* and the contract was substantially performed). When the transaction between the contracting parties is viewed in its entirety, it is clear that Jenkins substantially received the benefit of the bargain struck, as he has received millions of dollars. To release Jenkins from his obligations to USA because of the delay in one payment would be unduly harsh to USA, and this must be considered. *See Antonoff v. Basso,* 347 Mich. 18, 30, 78 N.W.2d 604 (1956) (quoting J. Cardozo, *Jacob & Youngs, Inc. v. Kent,* 230 N.Y. 239, 242–244, 129 N.E. 889).

The import of this is that Jenkins is bound to honor his contractual obligations, although he is entitled to interest on the late payment. USA technically breached its agreement with Jenkins; it had promised, in paragraph 2 of the Promissory Note, to make payment by March 4; by paying on April 20, it was some forty-seven days late of the original due date,[12] and within a few days of the due date extended by the grace period. *See Woody v. Tamer,* 158 Mich.App. 764, 772 (1987) (quoting RESTATEMENT CONTRACTS 2D § 235).

## C. Jenkins' Rights and Duties Relative to Acceleration

What remains to be considered is whether the agreement limits Jenkins' right to accelerate the balance of the Note. It is undisputed that the following express conditions precedent to Jenkins' right to accelerate, found in paragraph 5 of the Note, were fulfilled: proper notice of default by Jenkins, continuing default for thirty days thereafter, and proper notice of acceleration by Jenkins. It would seem, therefore, that a power to

---

**12.** The interest due Jenkins is properly computed over the entire period of forty-seven days.

accelerate was created in Jenkins. However, if the agreement between the parties contains a provision imposing a duty upon Jenkins to refrain from acceleration when one interest payment is tendered but two or three days after the end of the extended deadline, then Jenkins may not accelerate, for Jenkins is not relieved of this duty where USA has substantially performed, as explained above. *See* CORBIN, *supra,* § 721 (where there is provision that failure to perform on time creates a power of cancellation by notice, "the failure of performance on time does not itself discharge the other party from duty.")

Section 5.03 of the Stock Purchase Agreement contains the following language, which I find, under the circumstances of this case, imposes an affirmative duty on Jenkins to refrain from acceleration and to accept USA's late payment:

> Upon the terms and subject to the conditions hereof, each of **the parties hereto shall use all reasonable efforts under the circumstances** to take, or cause to be taken, all actions and to do, or cause to be done, all other things necessary, proper or advisable **to consummate and make effective as promptly as practicable the transactions contemplated by this Stock Purchase Agreement.** In furtherance and not in limitation of the foregoing, the parties hereto shall cooperate in using their reasonable efforts promptly . . . (b) to fulfill all conditions to the consummation of the transactions contemplated by this Stock Purchase Agreement. **Jenkins shall also cooperate** with and assist [USA] and its authorized representatives **in order to provide, to the extent reasonably requested by [USA], an efficient transfer of the control and ownership of Cabana and to avoid any undue interruption in the activities and operations of Cabana or [USA] following the Closing Date.** (emphasis added).

The language of this provision is clear and unequivocal: Jenkins has a duty to cooperate reasonably with USA to ensure that all of the transactions contemplated in the Stock Purchase Agreement, including payment, are carried out. Importantly, the provision re-

quires Jenkins to cooperate to avoid the undue interruption of USA's and Cabana's operations and activities following the Closing Date. If Jenkins is allowed to prevail on his claim that USA and AmeriFoods must tender $1,000,000 immediately, the operations and activities of Cabana and USA will no doubt be seriously hampered, as the financing of USA and AmeriFoods will be at risk. Where USA has requested Jenkins to refrain from acceleration and has tendered its check for the late interest payment within two or three days of the end· of the grace period, where Jenkins has not been harmed by this tardiness, and where Jenkins has received ample consideration to date, I must conclude that Jenkins' refusal to cooperate with USA and AmeriFoods is unreasonable, and in violation of the duty imposed on him at section 5.03. Therefore, I cannot permit acceleration.

■ Jenkins has argued that the language of section 5.03 did not survive closing of the Stock Purchase Agreement and does not apply, but the express language of the agreement does not support his position. Although the caption to Article V of the Stock Purchase Agreement does read **"ACTION PRIOR TO THE CLOSING,"** and the sentence underneath the caption repeats this, these must be disregarded, as section 11.07 of the Stock Purchase Agreement indicates that such titles and headings are inserted strictly for convenience and are not to affect the interpretation of the contract. Moreover, section 5.03 refers to "activities . . . following the Closing Date." Jenkins has interpreted the phrase "Jenkins shall cooperate . . . to avoid any undue interruption in the activities and operations of Cabana or [USA] following the Closing Date" as· referring to Jenkins' duty to refrain from taking action prior to the Closing Date which would disrupt the transfer of control of Cabana to USA. Plainly, Jenkins' reading is incorrect, for it would render the quoted language redundant as language providing for cooperation to ensure an orderly transfer of control directly precedes the phrase at issue. Contracts should not be read so as to render language superfluous.

■ Finally, Jenkins argues that because section 11.02(a) specifies that certain repre-

sentations and warranties contained in the Stock Purchase Agreement shall survive the Closing Date as specified, I must conclude that the parts of the Stock Purchase Agreement not listed, such as section 5.03, were never intended to survive closing. Section 11.02(b), however, provides that "[a]ll the covenants, agreements and obligations contained in this Stock Purchase Agreement shall survive in accordance with their terms." The duty to cooperate beyond the Closing Date, imposed in section 5.03, is included in this language, and it accordingly survives.

### Conclusion

For the reasons set forth above, Jenkins' motion for summary judgment is DENIED and the motion of USA and AmeriFoods for partial summary judgment is GRANTED.

IT IS SO ORDERED.