ANTONOFF *v.* BASSO.

1. CONTRACTS—PROFESSIONAL ENGINEER—CONSIDERATION.
   Contract by registered professional engineer to render professional services to architect in connection with construction of a building in return for a percentage of the building cost, *held,* to evidence that there was ample consideration running to both parties thereto.

2. SAME—PAROL EVIDENCE—COMPLETENESS OF WRITING.
   Parol evidence may be introduced to show a complete contract,

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 12 Am Jur, Contracts § 75 *et seq.*
[2] 12 Am Jur, Contracts § 235.
[3] 12 Am Jur, Contracts § 226 *et seq.*
[4] 12 Am Jur, Contracts § 232 *et seq.*
[5–7] 12 Am Jur, Contracts § 343.
[8] 12 Am Jur, Contracts § 344.
[9] 15 Am Jur, Damages § 165.

where memorandum made shows, obviously, that it does not contain all of the terms of the contract between the parties.

3. SAME—TEST OF COMPLETENESS.

The test of the completeness of the writing proposed as a contract is the writing itself; it being deemed a complete and unalterable exposition of the intentions of the parties if it bears evidence of careful preparation, of a deliberate regard for the many questions which would naturally arise out of the subject matter of the contract, and if it is reasonable to conclude from it that the parties therein expressed their final intentions in regard to the matters within the scope of the writing; and no presumption that it contains all of the terms of the contract exists if it shows such informality on its face.

4. SAME—CONSTRUCTION OF INCOMPLETE CONTRACT—PAROL EVIDENCE.

The trial court correctly heard parol evidence to ascertain the meaning of the term "services" in a written memorandum signed by defendant architect after interview with plaintiff, a registered professional engineer, where nothing was contained in the memorandum as to what duties were comprised and the memorandum was also otherwise obviously incomplete.

5. SAME—PERFORMANCE—DEVIATIONS.

A promisor under a contract is obligated to perform as he promised, but not every deviation from the performance promised so goes to the essence of the contract as to privilege the other to refuse to render a reciprocally promised performance.

6. SAME—SUBSTANTIAL PERFORMANCE.

There must be substantial performance of a contract to entitle the promisor thereof to performance by the other party of such other's promise, but there is no fixed formula by which substantial performance can be determined, it being a question of degree involving the resolution of many factors.

7. SAME — SUBSTANTIAL PERFORMANCE — EVIDENCE — PROFESSIONAL ENGINEER.

Trial court's finding that plaintiff, a professional engineer, had substantially performed his contract with defendant architect less what latter had to pay to make changes required which plaintiff should have made upon opportunity afforded to do so *held,* proper under evidence presented.

8. SAME—PERFORMANCE—COMPENSATION—SET-OFF OF DAMAGES FOR FAILURE OF COMPLETE PERFORMANCE.

A plaintiff who has performed valuable services for defendant under a contract, of which the latter had reaped the ad-

vantage, is entitled to recover therefor at the rate fixed by the contract less any damages defendant may have suffered by reason of failure in complete performance.

9. INTEREST—UNLIQUIDATED CLAIM—CONTRACTS.
   Interest was properly denied plaintiff in action on contract, where claim asserted was an unliquidated one.

Appeal from Wayne; Maher (Thomas F.), J. Submitted June 14, 1956. (Docket No. 27, Calendar No. 46,815.) Decided October 1, 1956.

Assumpsit by Steven Antonoff, individually and doing business as Steven Antonoff and Associates, against Victor J. Basso for professional engineering services in connection with building plans. Defendant claims set-off and recoupment. Judgment for plaintiff with certain allowances to defendant. Plaintiff appeals. Defendant cross-appeals. Affirmed.

*Wilfrid L. Burke*, for plaintiff.

*Kelly, Kelly & Kelly* (*Sigmund A. Beras*, of counsel), for defendant.

SMITH, J. This is assumpsit on a written contract, with the common counts added as count 2. Steven Antonoff, individually and doing business as Steven Antonoff and Associates, is the plaintiff. He is a registered professional engineer and is suing an architect, Victor J. Basso, by whom he was once employed.

The parties first met in 1949. The plaintiff was branching out on his own as an engineer, and, in the process of scratching up some business, called on defendant Victor J. Basso. We need not review their exploratory conversations or work projects. Apparently they were satisfactory to both parties, for plaintiff was retained by defendant to prepare the structural, mechanical and electrical engineering plans for the Mercywood Hospital in Ann Arbor.

The plaintiff commenced his work in May of 1950. It is the duty of the engineer, we are told, after he has received the preliminary plans of the architect, to prepare the detailed engineering drawings:

"When a professional engineer [testified Antonoff] works for an architect he offers an engineering service to an architect in structural, mechanical and electrical fields. He provides the frame, in structural fields, he provides piping, that is plumbing, he provides the boilers for heating purposes, he estimates the heat, heat losses and he specifies the sizes of the radiators. In the electrical field he provides the needed power of lighting and such other things as an architect directs him, or asks him, or tells him, or passes on the information for the client.

"When we talk about architectural design, the architect conceives the structure in each form, understand, as such, he subdivides the room, he allocates the occupancy of these various rooms and tells the engineer. That is that, you see, the engineer takes it up from there and provides the blue prints to carry the structure on the frame, and gives the heating equipment, designs, heating equipment, and the electrical, lighting or outlets or whatever the architect wants him to do."

Plaintiff submitted his engineering plans and specifications, so prepared, to the defendant on or about September 30, 1950. Shortly afterward he sent defendant a bill for $15,760 for engineering services rendered. Mr. Basso was "aghast," he says, when he received this invoice. "I just didn't know whether he had made a mistake or what it was so I called him and told he had better get down and meet with me and go over the figures and for him to check it, that these are away out." Plaintiff did come down. They discussed the matter and signed an agreement with respect thereto. The versions of the parties differ as to what took place at the signing, and the reasons therefor. The entire rec-

ord, in fact, is marked by a series of irreconcilable contradictions. The divergencies of the parties with respect to the discussion above mentioned are characteristic. According to plaintiff he had no idea why defendant wanted a signed contract, and did not know even at the time of trial. His version runs substantially as follows:

"As to my bill Mr. Basso mentioned it. He told me that the bill was very reasonable and it wasn't high, and I said, 'Yes, I was very successful in cutting the expenses to the bone and passing it on,' and I said, 'I told you sometime before when you were asking me how much it is likely to cost that it will not be high,' and Mr. Basso was perfectly satisfied.

"*Q.* You also testified yesterday on direct examination that you didn't know why Mr. Basso wanted a contract?

"*A.* No. I don't, I even now don't.

"*Q.* And there was some argument as to whether you should receive 1%, 1-1/2%, 2% of what?

"*A.* Of the cost. They were not—when I gave him this one, understand, he said that was very nice but he wanted to get a contract for some reason. 'Now will you sign a contract with us for 1%?' 'No.' 'For 2%?' 'No.' 'For 2-1/2% or so?' 'No.' 'For 3%?' Three percent is likely to be high. I don't know why. No, he wants a contract on it, and I signed it with him.

"*Q.* He wanted a 3% contract even though it was supposed to be high?

"*A.* Yes. Whether he knew whether it was going to be higher or lower than that, I don't know.

"*Q.* That was a pretty bad risk on his part?

"*A.* On whose part?

"*Q.* On Mr. Basso to sign that contract with you.

"*A.* I can't explain what was back of it."

According to Mr. Basso, however, what was back of it was an effort to reach agreement as to fees, both parties agreeing that there was no fee arrange-

ment at the time the work was undertaken. Defendant Basso testified that he first protested the fee requested:

"I says didn't he know when he brought there (these?) figures here, I told him, I said, 'Don't you know how much this building was going to cost?' And he says, 'Yes, you told me around a million dollars.' 'Well,' I says, 'Yes, how do you figure that the structural—these type offers in here, they are very ridiculous.' I says, 'If I pay you this kind of fees it certainly does not leave anything for my fees and my work is certainly twice as much as your work, besides hiring you, you are one of my subordinates.' I says, 'That is not fair at all.' The invoice also says 'fees to date.' I says, 'Your plans are not complete.' I says, 'You have lots of work to do.' He says, 'Yes, yes, I know it, I have a lot of work on the plans too and there is a lot of work, you know how the jobs are.' Changes are made every day as long as the job goes."

He then proposed to sign a contract for 2%. This plaintiff Antonoff refused.

"Then I suggested to him, 'I have been paying 2%. There is work coming in here.' I said, 'Will you be satisfied if we sign a contract now, I am not trying to gyp you or anything. I will give you 2%. You know what it was. I will sign a contract for 2%.' Well, he jumped out of that chair. I thought he would hit the ceiling, he jumped on the floor, he said, 'I can't do business with you. I can't do that. I am losing money right here.' He says, 'I am losing money for these figures.' 'Well,' I says, 'all right, you know there is a lot of work to be done. I am busy. Let's get this thing straightened out.' I says, 'I would like to pay you a fair wage and everything and I like to coordinate things,' and I says, 'How much would you want?' And I says, 'Now don't forget there is work to be done and there is supervision to be done.' Well, he hemmed and hawed back

and forth for a while and then he came up with a figure and said, 'I will do some supervision for you and do all changes you want. I don't care how many changes you want.' "

It was as a result of these negotiations, and these discussions as to the reasonableness of the fee submitted, that the agreement between the parties, hereinafter set forth, was executed. Plaintiff was paid on the date the sum of $5,000, in addition to which he was paid $2,500 on subsequent occasions. We note in passing that under these circumstances there was ample consideration running to both of the parties hereto.

Little occurred now for about a year. Sewage disposal facilities in Ann Arbor were incomplete. At approximately the end of the period, on December 12, 1951, defendant wrote to plaintiff, telling him that bids had been invited from several contractors "on your plans for Mercywood Sanitarium," that the plans had been criticized in various particulars, and concluded by informing plaintiff that:

"The above criticism by reliable practical men in the field leaves me no choice but to request that your plans and specifications be corrected, redesigned in a practical manner, and properly coordinated with a complete set of specifications before final payment for your services could be considered."

(Previous to this defendant had orally complained to plaintiff of objections to the plans by contractors.) It was at this time that the "2 parties got into a wrangle * * * and there was a parting of the ways."

Plaintiff asserts that he never received precise criticisms of his plans, that what he received was merely "a general complaint, very vaguely put." Nevertheless he looked over the plans "in view of the complaints that were made," but, he testified,

he "could not find any justification for the complaints." His letter to defendant, dated June 25, 1952, is to the same effect; he finds "no cause for your rash and unjustified claims." It was the position of the defendant, on the other hand, that the plans and specifications of the plaintiff were not in accordance with the requirements of the Sisters of Mercy, and that, at an early meeting, defendant had told plaintiff that the work was being undertaken for the Sisters of Mercy, who had certain standard requirements for their many hospitals, with which he would have to conform. (There is no question but that the architectural plans as finally drawn in 1952 were different from the plans submitted in 1950. The revisions were partly at the request of the Sisters of Mercy, and partly upon information secured by the defendant from specialists in the various fields.)

As a result, then, of the complaints made, and following plaintiff's letter of June 25th, a meeting between the parties was held. Defendant described it, in part, as follows:

"The plans were discussed and his fees were discussed. Well, the plans were not correct. The plans and specifications they could not tie in with each other and there were numerous errors and omissions, the plans weren't clear, the dimensions weren't read, you couldn't read the dimensions on the job, the piping was wrong, the size of the water line was wrong, and the method of running his mains was wrong. That was pointed out to him at this conference. He was asked to make changes. He was asked to consult with Davis Brothers who were to do the plumbing and heating. He consulted with me and he knew that; that he had to consult with them. I advised him of that."

The plaintiff, however, refused to redraw, or correct, the plans. Consequently defendant hired others to do the work. In this action plaintiff sued for the

amount of his fees under the arrangement described and defendant claimed a set-off for various items, including the expense of having the plaintiff's engineering plans corrected by other engineers. The lower court found that the contracts let for structural, mechanical, and electrical work on the project amounted to $525,000, and that plaintiff was entitled to 3% thereof, or $15,750, less the $7,500 paid. The court also deducted from plaintiff's recovery the sum of $4,137.80, as the cost to defendant of correcting the plans submitted by plaintiff and entered judgment against the defendant for $4,112.20. Plaintiff has appealed the amount of the judgment and defendant has cross-appealed, asking, for relief, that the judgment of the trial court be set aside, a judgment of no cause for action entered on plaintiff's claim, and a judgment in favor of appellee, on his set-off and recoupment, of $7,500 paid by appellee to the plaintiff under the contract.

Before we can determine whether or not there has been a breach of contract, we must determine what the contract requires. Here the entire contract for a job "supposed to cost a million dollars" follows in its entirety:

"December 28, 1950

"Mr. Steven Antonoff
"5 W. Larned Street
"Detroit 26, Michigan
            "Re: Mercywood Sanitarium Ann Arbor
                  St. Joseph's Hospital Ann Arbor
"As agreed this date the fee for services on the above jobs will be as follows:

"Mechanical fee to be 3% of the contracts let for the mechanical trades;

"Electrical fee to be 3% of the contracts let for the electrical trades;

"Structural fee to be 3% of the structural contract let for the structural trades.

"/s/ VICTOR J. BASSO A.I.A.

"Victor J. Basso

"Approved: Date Dec. 2, 1950

"By STEVEN ANTONOFF /s/"

It will be observed that the contract is somewhat lacking in detail. It purports to set a fee for "services" but it does not indicate in any way what duties are comprised within the term. There are no defining clauses. No times are specified for payments. There are no terms expressed, no conditions, no standards of performance. We need not elaborate. A mere reading of the "agreement" betrays its deficiencies. When we are called upon to construe a contract so lacking in expression we will not commit ourselves to utter frustration by refusing to hear parol concerning the circumstances surrounding its execution and the meaning of its terms. The parol evidence rule has no application where the writing in question is a mere informal statement of some and not all of the terms of the agreement, particularly where the very terms used are vague in meaning and are undefined in the instrument. The rule to be applied in such case, we stated in *Brady* v. *Central Excavators, Inc.,* 316 Mich 594, 606, quoting Jones on Construction of Commercial & Trade Contracts, § 134, in the following terms:

" 'The test of the completeness of the writing proposed as a contract is the writing itself. If this bears evidence of careful preparation, of a deliberate regard for the many questions which would naturally arise out of the subject matter of the contract, and if it is reasonable to conclude from it that the parties have therein expressed their final intentions in regard to the matters within the scope of the writing, then it will be deemed a complete and unalterable exposition of such intentions. If, on the

other hand, the writing shows its informality on its face, there will be no presumption that it contains all the terms of the contract. In every case, therefore, the writing must be critically examined in the light of its surrounding circumstances, with a view of determining whether it is a memorial of the transaction.' "

To ascertain the meaning of the term "services," then, the trial court correctly heard parol and we agree with its conclusion that it was the intent of the parties that plaintiff Antonoff should "work along and make various changes as suggested." It is clear that he refused so to do.

From this point the defendant takes the next step, that plaintiff's breach of the agreement by failure to work along and make the various changes required precludes his recovery on the contract. The question presented is one involving the doctrine of substantial performance. A promisor, it is true, is obligated to perform as he promised. This does not mean, however, that every deviation from the performance promised so goes to the essence of the contract as to privilege the other to refuse to render a reciprocally promised performance. Substantial performance, however, there must be. What amounts to substantial performance? There is no fixed formula. The question is one of degree, its determination involving the resolution of many factors. 3 Corbin on Contracts, § 704, puts the matter well in these terms:

"It is not easy to lay down rules for determining what amounts to 'substantial performance,' sufficient to justify a judgment for the contract price (subject to a counterclaim for injury, if asserted) in any particular case. It is always a question of fact, a matter of degree, a question that must be determined relatively to all the other complex factors that exist in every instance. The variation in these factors is

such that generalization is difficult and the use of cases as precedents is dangerous.

"This is not to say that rules are impossible or that precedents are useless. Here, as elsewhere, guiding suggestions are of value; but they must not be taken as rules of thumb, or used as implacable major premises. Here, as elsewhere, case experience can not be dispensed with; and justice is not to be expected from one who scorns the light of such experience."

The classic case exposition of the doctrine is that of Mr. Justice Cardozo in *Jacobs & Youngs, Inc.,* v. *Kent,* 230 NY 239, 242–244 (129 NE 889, 23 ALR 1429), in these words:

"Considerations partly of justice and partly of presumable intention are to tell us whether this or that promise shall be placed in one class or in another. The simple and the uniform will call for different remedies from the multifarious and the intricate. The margin of departure within the range of normal expectation upon a sale of common chattels will vary from the margin to be expected upon a contract for the construction of a mansion or a 'skyscraper.' There will be harshness sometimes and oppression in the implication of a condition when the thing upon which labor has been expended is incapable of surrender because united to the land, and equity and reason in the implication of a like condition when the subject matter, if defective, is in shape to be returned. From the conclusion that promises may not be treated as dependent to the extent of their uttermost minutiae without a sacrifice of justice, the progress is a short one to the conclusion that they may not be so treated without a perversion of intention. Intention not otherwise revealed may be presumed to hold in contemplation the reasonable and probable. If something else is in view, it must not be left to implication. There will be no assumption of a purpose to visit venial faults with oppressive retribution.

"Those who think more of symmetry and logic in the development of legal rules than of practical adaptation to the attainment of a just result will be troubled by a classification where the lines of division are so wavering and blurred. Something, doubtless, may be said on the score of consistency and certainty in favor of a stricter standard. The courts have balanced such considerations against those of equity and fairness, and found the latter to be the weightier. The decisions in this State commit us to the liberal view, which is making its way, nowadays, in jurisdictions slow to welcome it (*H. Dakin & Co., Ltd.,* v. *Lee,* [1916] 1 KB 566, 579). Where the line is to be drawn between the important and the trivial cannot be settled by a formula. 'In the nature of the case precise boundaries are impossible' (2 Williston on Contracts [1921], § 841). The same omission may take on one aspect or another according to its setting. Substitution of equivalents may not have the same significance in fields of art on the one side and in those of mere utility on the other. Nowhere will change be tolerated, however, if it is so dominant or pervasive as in any real or substantial measure to frustrate the purpose of the contract (*Crouch* v. *Gutmann,* 134 NY 45, 51 [31 NE 271, 30 Am St Rep 608]). There is no general license to install whatever, in the builder's judgment, may be regarded as 'just as good' (*Easthampton L. & C. Co., Ltd.,* v. *Worthington,* 186 NY 407, 412 [79 NE 323]). *The question is one of degree, to be answered, if there is doubt, by the triers of the facts (Crouch v. Gutmann; Woodward v. Fuller* [80 NY 312]), *and, if the inferences are certain, by the judges of the law. (Easthampton L. & C. Co., Ltd.,* v. *Worthington, supra.)* We must weigh the purpose to be served, the desire to be gratified, the excuse for deviation from the letter, the cruelty of enforced adherence. Then only can we tell whether literal fulfillment is to be implied by law as a condition. This is not to say that the parties are not free by apt and certain words to effectuate a purpose that performance of

every term shall be a condition of recovery. That question is not here. This is merely to say that the law will be slow to impute the purpose, in the silence of the parties, where the significance of the default is grievously out of proportion to the oppression of the forfeiture. The willful transgressor must accept the penalty of his transgression (*Schultze* v. *Goodstein*, 180 NY 248, 251 [73 NE 21]; *Desmond-Dunne Co.* v. *Friedman-Doscher Co.*, 162 NY 486, 490 [56 NE 995]). For him there is no occasion to mitigate the rigor of implied conditions. The transgressor whose default is unintentional and trivial may hope for mercy if he will offer atonement for his wrong (*Spence* v. *Ham* [163 NY 220 (57 NE 412, 51 LRA 238)])." (Emphasis supplied.)

And so it is we have held for years that we will not make exact, precise, performance the price of benefits under the contract. The deviation may be slight, the dereliction going not to the root. *Wildey* v. *Fractional School District No. 1*, 25 Mich 419; *Gutov* v. *Clark*, 190 Mich 381. What was the situation in the case at bar? Was plaintiff's breach substantial, so as to preclude his recovery on the contract? The case is not easy. Possibly that is why it is before us. But when we consider the relative extent of the performance, its degree and value, the furtherance or hindrance of the over-all project by the deviations involved, the good faith, or lack thereof, of him whose performance was less than ideal, we are constrained to agree with the trial court's opinion, expressed in these words:

"Was there too much wrong with them? Would he have gone into that contract if the various inconsistencies and incomplete work as contended by the defendant existed? The court's answer to that is 'no.' Further the changes that were made subsequent to the submission of the various plans were not too much or too great so that it would lead the court to believe that originally these plans were not

done in a good workmanlike manner. However, the court does believe that Mr. Antonoff was given an opportunity to make certain corrections and did not make them. The court feels, after listening to Mr. Antonoff's testimony, that he is a high strung, explosive, volatile soul and under pressure is a pretty hard man to do business with."

Substantial performance, then, there was. Yet he who deviates from his undertaking acts not with impunity. While he has a right to the contract price he labors under a corresponding disability: he must respond in compensatory damages for his breach. Thus the trial court properly allowed plaintiff the contract price less expenses incurred by defendant in making the changes required. *Keystone Lumber & Salt Manfg. Co.* v. *Dole,* 43 Mich 370; *Fuller* v. *Rice,* 52 Mich 435; *Oakley* v. *Duluth Superior Dredging Co.,* 223 Mich 478. As expressed in the *Fuller Case* (p 437):

"If the plaintiff had performed valuable services for the defendant under the contract, of which the latter had reaped the advantage, he was entitled to recover therefor at the rate fixed by the contract, less any damages the defendant may have suffered by reason of failure in complete performance. *Allen* v. *McKibbin,* 5 Mich 449, 454; *Whipple* v. *Parker,* 29 Mich 369; *Wildey* v. *Fractional School District No. 1,* 25 Mich 419; *Burroughs* v. *Morse,* 48 Mich 520. This was the view taken by the circuit judge."

The trial court properly denied plaintiff's demand for interest on the unliquidated claim asserted (*Township of Royal Oak* v. *City of Berkley,* 309 Mich 572; *In re Snow's Estate,* 319 Mich 333) and entered judgment, correctly computed both in theory and amount, in the sum of $4,112.20.

The judgment is affirmed. Costs to appellee.

DETHMERS, C. J., and SHARPE, EDWARDS, BOYLES, KELLY, CARR, and BLACK, JJ., concurred.