# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

TROY 888 LLC,

        Plaintiff-Counterdefendant-
        Appellee,

v

SUMMIT WILSHIRE LLC,

        Defendant-Counterplaintiff-
        Appellant,

and

WELLS FARGO BANK NA and MAX J
CORPORATION,

        Defendants.

UNPUBLISHED
November 29, 2018

No.  338393
Oakland Circuit Court
LC No.  2016-153128-CZ

---

TROY 888 LLC,

        Plaintiff-Counterdefendant-
        Appellant,

v

SUMMIT WILSHIRE LLC,

        Defendant-Counterplaintiff-
        Appellee,

and

WELLS FARGO BANK NA and MAX J
CORPORATION,

        Defendants.

No.  339349
Oakland Circuit Court
LC No.  2016-153128-CZ

---

Before:  SHAPIRO, P.J., and SERVITTO and GADOLA, JJ.

-1-

PER CURIAM.

In docket no. 338393, Summit Wilshire, LLC, appeals as of right a judgment entered after a bench trial quieting title to parcel of real property in favor of Troy 888, LLC. In docket no. 339349, Troy 888, LLC appeals as of right the trial court's denial of its post-trial motion requesting the award of sanction in its favor and against Summit Wilshire, LLC. We affirm in both cases.

At one time, defendant Max J Corporation ("Max J") owned a single, undivided parcel of land in Troy, Michigan. Max J then subdivided the parcel of land, selling part of the subdivided land to Robert Sosnick ("Sosnick"). Max J and Sosnick, as part of the sale, entered into an agreement on or about December 28, 1978, under which Sosnick was required to build a retention pond on a two to three acre portion of the property that Max J retained in order to meet the drainage needs of both Sosnick and Max J's properties. Under the agreement ("the retention pond agreement"), once the pond was built, Max J would quitclaim the small parcel of property upon which the pond was built ("the retention pond parcel") to Sosnick. The retention pond parcel was, in fact, quitclaimed to Sosnick on June 11, 1980. Sosnick maintained the retention pond as per the agreement. Plaintiff, Troy 888 LLC ("plaintiff") eventually purchased the Sosnick parcel of land and defendant Summit Wilshire LLC ("defendant") eventually purchased the Max J property such that their parcels of land are adjacent.

The retention pond agreement contained a reverter clause, providing that when the City of Troy built a permanent drainage system servicing the Sosnick parcel of land, the retention pond parcel would revert to and become the sole property of Max J or its successors in interest (here, defendant). According to plaintiff, because no such drainage system has yet been built by the City of Troy and the right of reverter has expired pursuant to statute, plaintiff is the fee simple title owner to the retention pond parcel. It thus brought a complaint against defendant to quiet title to the property in its favor.[1] Defendant brought counterclaims against plaintiff for adverse possession of the retention pond parcel, an easement by prescription, and acquiescence.

Plaintiff moved for summary disposition in its favor on both its own claim and on defendant's counterclaims against it. The trial court found that plaintiff was entitled to summary disposition regarding one of defendant's affirmative defenses, denied summary disposition to plaintiff on its claim against defendant, and granted plaintiff's motion for summary disposition on defendant's counterclaims. Defendant thereafter moved for leave to amend its counterclaims, which the trial court denied because it found that amendment would be futile. The matter then proceeded to a bench trial, at the conclusion of which the trial court found that none of the triggering conditions under the retention pond agreement had been met and that title in the retention pond parcel was thus quieted in favor of plaintiff. The trial court ultimately entered a judgment in favor of plaintiff and against defendants, declaring that defendants have no rights of

---

[1] Plaintiff also brought claims against defendants Wells Fargo Bank NA, solely because it has a lien on the property due to mortgages, and Max J Corporation, in case it asserted any interest in the retention pond parcel.

reversion over the retention pond parcel. The trial court later denied plaintiff's motion for sanctions against defendant and these appeals followed.

On appeal, defendant first asserts that the trial court erred in declining to apply the doctrine of substantial performance to the retention pond agreement. This issue, indeed this case, involves the proper interpretation and application of the retention pond agreement entered into between Robert Sosnick and Max J Corporation in 1978, because that contract binds all successors in interest and plaintiff is the successor in interest to Sosnick, while defendant is the successor in interest to Max J. The proper interpretation of a contract is a question of law that this Court reviews de novo. *In re Smith Tr*, 274 Mich App 283, 285; 731 NW2d 810 (2007).

This Court reviews the trial court's factual findings after a bench trial and in an equitable action for clear error, and its legal conclusions de novo. *Harbor Park Mkt, Inc v Gronda*, 277 Mich App 126, 130; 743 NW2d 585 (2007). A finding is clearly erroneous only when the appellate court is left with a definite and firm conviction that a mistake has been made. *Id*.

The retention pond agreement provides that prior to occupying any building constructed on the property he purchased from Max J, Sosnick was required to construct a retention pond and storm drainage system on the retention pond parcel at his own expense. Sosnick was also required to pay the taxes on the retention pond parcel and was further to maintain the pond at his own cost.[2] Max J and any and all of his successors had the right to utilize the retention pond for storm drainage purposes, without compensation at any time to Sosnick. According to the retention pond agreement, Max J would, upon approval of the retention pond site by the City of Troy, execute and deliver a quit claim deed to Sosnick covering the retention pond parcel. Provision 3. of the retention pond agreement provides, in relevant part:

> At such time as the City of Troy shall install a permanent storm drainage system which serves the Premises [Sosnick's land], Sosnick shall connect the storm drainage system on the premises into such municipal drainage system, at his own expense, and, at a point within the boundaries of the premises, shall close off and stub the sewer line running from the premises to the retention pond. At such time, the [retention pond parcel] shall revert to and become the sole property of Max J., or its successors in interest . . . .

The retention pond agreement was to be "binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors, and assigns."

It is undisputed that plaintiff, as Sosnick's successor, maintained the pond and paid all of the taxes on the retention pond parcel. The only issue for our resolution is whether the above reverter clause was triggered such that title to the retention pond parcel should revert to defendant as successor to Max J.

---

[2] Sosnick was given a credit at the closing on the property for the anticipated costs of constructing the pond and drainage system.

G. Scott Finlay, a civil engineer with the City of Troy, testified at trial that the water from the pond at issue goes into a storm sewer, specifically the Lane drain. He testified that the Lane drain used to be an open ditch but was replaced with a pipe that ran underground in June or July of 1987, when private developers and their contractors had the work of closing the drain performed and paid for it themselves. According to Finlay, the Lane drain is an Oakland County drain and responsibility for maintaining the drain is with Oakland County.

Finlay further testified that there is no doubt that drains run from the buildings on plaintiff and defendant's property into the retention pond. He testified that the sewer lines for plaintiff's property were installed in 1979 or 1980 when the building was built and the sewer lines for defendant's building would have been installed in the early 1980's when it was built.

Finlay testified that it is not possible that anyone "stubbed off"[3] any drains from plaintiff and defendant's buildings to the pond because there would have been flooding in the parking lots. Before the closing off of lines going into the retention pond, one would need to find an alternate outlet for the storm sewer lines such as an additional pump line, according to Finlay.

By the specific terms in the retention pond agreement, the reverter clause is triggered when the City of Troy installs a permanent storm drainage system that serves plaintiff's property. Finlay testified that the City of Troy does not install storm drainage systems and no such system serving plaintiff's property was dedicated to the City of Troy. The reverter clause was thus not triggered. Defendant contends that there was "substantial compliance" with the agreement such that the reverter clause should nonetheless be triggered. This argument fails for several reasons.

First, we read and apply a contract as specifically written. Contracts are enforced according to their terms. *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005). This Court examines contractual language and gives the words their plain and ordinary meanings. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007). If the language of the contract is unambiguous, we construe and enforce the contract as written, according to its plain meaning, as a matter of law. *Id*. Only when contractual language is ambiguous (when two provisions irreconcilably conflict with each other or when is equally susceptible to more than a single meaning) does its meaning become a question of fact. *Id*. at 503-504.

Defendant does not contend that the contract at issue is ambiguous and, it is not. The reverter clause in the retention pond agreement requires the installation of a storm drainage system by the City of Troy which serves plaintiff's property. The undisputed testimony is that the City of Troy does not install storm drainage systems and did not do so in this case.

Second, it appears that when the retention pond was built or at least shortly thereafter, it led into the open ditch called the Lane drain. That has not changed. Plaintiff put a building on its property and defendant did as well. Their sewer lines went directly into the pond, which did,

---

[3] Finlay defined "stubbing off" as closing a line by means by constructing a bulkhead on it that would physically prevent storm water running inside the pipe from leaving the pipe.

and still does, lead into the now-enclosed Lane drain. Nothing appears to have substantially changed since the retention pond agreement was entered into.

Finally, substantial performance does not apply. The trial court did, contrary to defendant's claim, consider defendant's argument on this issue finding that substantial performance should not be invoked in this case. Based on controlling case law, this finding was correct.

One of the first cases discussing the doctrine of substantial performance is *Antonoff v Basso*, 347 Mich 18; 78 NW2d 604 (1956). In that case, our Supreme Court stated, "What amounts to substantial performance? There is no fixed formula. The question is one of degree, its determination involving the resolution of many factors." *Id*. at 28. The Court then stated:

> The classic case exposition of the doctrine is that of Mr. Justice Cardozo in *Jacob & Youngs, Inc, v Kent*, 230 NY 239, 242-244; 129 NE 889, 890; 23 ALR.1429, in these words:
>
>> "Considerations partly of justice and partly of presumable intention are to tell us whether this or that promise shall be placed in one class or in another. The simple and the uniform will call for different remedies from the multifarious and the intricate. The margin of departure within the range of normal expectation upon a sale of common chattels will vary from the margin to be expected upon a contract for the construction of a mansion or a 'skyscraper.' There will be harshness sometimes and oppression in the implication of a condition when the thing upon which labor had been expended is incapable of surrender because united to the land, and equity and reason in the implication of a like condition when the subject-matter, if defective, is in shape to be returned. From the conclusion that promises may not be treated as dependent to the extent of their uttermost minutiae without a sacrifice of justice, the progress is a short one to the conclusion that they may not be so treated without a perversion of intention. Intention not otherwise revealed may be presumed to hold in contemplation the reasonable and probable. If something else is in view, it must not be left to implication. There will be no assumption of a purpose to visit venial faults with oppressive retribution.
>>
>> ***
>>
>> Substitution of equivalents may not have the same significance in fields of art on the one side and in those of mere utility on the other. Nowhere will change be tolerated, however, if it is so dominant or pervasive as in any real or substantial measure to frustrate the purpose of the contract. [Id. at 29-30]

Later, this Court, in *Rogers Plaza, Inc v SS Kresge Co*, 32 Mich App 724, 746; 189 NW2d 346 (1971), noted that "substantial performance" was defined in 17A CJS. Contracts s 508, p. 814 as follows:

> Substantial performance means not doing the exact thing promised, but doing something else that is just as good, or good enough for both obligor and obligee. It requires a good-faith attempt to perform without intentional or material departures.

In *Gibson v Group Ins Co*, 142 Mich App 271, 275–76; 369 NW2d 484 (1985), this Court further stated:

> Michigan cases regarding forfeiture of contract rights are fairly summarized by the following commentary: Michigan follows the substantial performance of contract rule. The common-law rule was that performance as a condition precedent to recovery on a contract must be strict performance in accordance with the terms of the contract.
>
> A contract is substantially performed when all the essentials necessary to the full accomplishment of the purposes for which the thing contracted has been performed with such approximation that a party obtains substantially what is called for by the contract.
>
> Generally speaking, deviations from the absolute terms of a contract do not necessarily cause a failure of performance, but may entitle a party to extra compensation or damages. Imperfections in the matters of details which do not constitute a deviation from the general plan do not prevent the performance from being regarded as substantial performance. On the other hand, where the deviations or alterations are such as would essentially change the terms of performance, they will be considered as a failure of performance. 6A Michigan Law & Practice, Contracts, § 314, pp. 315-316 (footnotes omitted). [quotation marks omitted]

As can be seen by the language defining the substantial performance doctrine, and in all of the cases finding the doctrine applicable, the focus is on the actions of the contracting parties to determine if they have substantially met their obligations under the contract. Generally, this doctrine becomes an issue if one party to the contract is accused of breaching the contract (i.e., not performing its contractual obligation). In this case, there is no issue concerning whether the parties to the contract, or the instant parties as their successors in interest have met their initial obligations under the contract. What defendant fails to recognize is that the reverter clause contains an additional obligation on plaintiff's part *only* when the City of Troy installs a permanent storm drainage system that serves plaintiff's property. The retention pond agreement specifically states, "At such time as the City of Troy shall install a permanent storm drainage system which serves the Premises [Sosnick's land], Sosnick shall connect the storm drainage system on the premises into such municipal drainage system . . . ." As such, the action by third-party City of Troy is a condition precedent to any further action or obligation by plaintiff under the retention pond agreement. That condition precedent is the trigger to the reverter clause.

-6-

"A 'condition precedent' is a fact or event that the parties intend must take place before there is a right to performance. A condition precedent is distinguished from a promise in that it creates no right or duty in itself, but is merely a limiting or modifying factor." *Real Estate One v Heller*, 272 Mich App 174, 179; 724 NW2d 738 (2006) (citations omitted). "Failure to satisfy a condition precedent prevents a cause of action for failure of performance." *Able Demolition v Pontiac*, 275 Mich App 577, 583; 739 NW2d 696 (2007), quoting *Berkel Co Contractors v Christman Co*, 210 Mich App 416, 420; 533 NW2d 838 (1995). "If the condition is not fulfilled, the right to enforce the contract does not come into existence." *Knox v Knox*, 337 Mich 109, 118; 59 NW2d 108 (1953) (citations omitted).

More recently, a panel of this Court, in *Rodgers v JPMorgan Chase Bank NA*, 315 Mich App 301, 310; 890 NW2d 381 (2016), specifically stated that the doctrine of substantial performance "is inapplicable to the fulfillment of express conditions." *Id*. at 310. The *Rodgers* Court noted that Black's Law Dictionary defined the substantial performance doctrine as "[t]he rule that if a good-faith attempt to perform does not precisely meet the terms of an agreement or statutory requirements, the performance will still be considered complete if the essential purpose is accomplished." *Id*. The *Rodgers* Court thus concluded that "[t]he doctrine of substantial performance is used to determine whether a party can be considered to have fulfilled its obligation under a contract even though that party has not fully performed." *Id*.

Here, the doctrine of substantial performance is inapplicable to the express condition precedent that the City of Troy installs a permanent storm drainage system which serves plaintiff's land. Because the condition precedent did not occur, the reverter clause was not triggered.

Defendant next contends that the trial court erred in granting plaintiff's motion for summary disposition concerning its affirmative defense asserting that the "public purpose" exception to the 30 year limitation on the duration of reverter rights was applicable.

We review a trial court's decision on a motion for summary disposition de novo. *Spiek v Michigan Dept of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). A motion under MCR 2.116(C)(9) tests the sufficiency of the defendant's pleadings, and should be granted where the defendant has failed to state a valid defense to a claim. *Payne v Farm Bureau Ins*, 263 Mich App 521, 525; 688 NW2d 327 (2004). The interpretation and application of a statute is a question of law that this Court also reviews de novo. *Detroit Pub Sch v Conn*, 308 Mich App 234, 246; 863 NW2d 373 (2014).

The Possibilities of Reverter and Rights of Entry Act, MCL 554.61, *et seq.*, was enacted to "limit the duration of possibilities of reverter and rights of entry in conveyances of real property in certain cases." See editor's note to PA 19 1968, No 13. To that end, MCL 554.62 provides that "If the specified contingency does not occur within 30 years after the terminable interest is created, the right of termination by reason of the specified contingency shall be unenforceable." MCL 554.61 defines the relevant terms as follows:

(a) "Terminable interest" is a possessory or ownership interest in real property which is subject to termination by a provision in a conveyance or other instrument which either creates a right of reversion to a grantor or his heirs, successors or assigns or creates a right of entry on the occurrence of a specified contingency.

(b) "Specified contingency" is the event described in a conveyance or other instrument creating a terminable interest, the occurrence of which requires or permits the divesting of the terminable interest.

MCL 554.64, however, provides exemptions to this rule including "(c) If the terminable interest is held for public, educational, religious or charitable purposes." Defendant contends that MCL 554.64(c) applies in this instance because the terminable interest (plaintiff's ownership interest in the retention pond parcel) is held for public purposes. We disagree.

"Public purpose" is not defined in the statute. In construing a statute, this Court gives the terms of the statute their plain and ordinary meaning and, in doing so, may consult dictionary definitions. *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). "Public purpose is defined in Black's law Dictionary (7th ed.) as "An action by or at the direction of a government for the benefit of the community as a whole." Our Supreme Court recognized long ago that:

> [I]t is difficult, if not impossible, to give to the expression ["public purpose"] a definite meaning that will be applicable under any and all circumstances. In 37 Am Jur, p. 734, it is said: "A public use changes with changing conditions of society, new appliances in the sciences, and other changes brought about by an increase in population and by new modes of transportation and communication. The courts as a rule have attempted no judicial definition of a public as distinguished from a private purpose, but have left each case to be determined by its own peculiar circumstances. Generally, a public purpose has for its objective the promotion of the public health, safety, morals, general welfare, security, prosperity, and contentment of all the inhabitants or residents within the municipal corporation, the sovereign powers of which are used to promote such public purpose. [*Hays v City of Kalamazoo*, 316 Mich 443, 453–54; 25 NW2d 787 (1947).

In the singular published decision addressing MCL 554.64(c), *Ludington & N Ry v Epworth Assembly*, 188 Mich App 25, 28; 468 NW2d 884 (1991), this Court was called upon to determine the parties' respective interests in five adjoining strips of land. The five parcels of land are adjoining fifty-foot-wide strips of land upon which the plaintiff's railroad track is located. The strips of land pass through the land of defendant, a Michigan corporation comprised of owners of resort cottages. *Id*. Originally, in 1895, defendant conveyed the southernmost strip of the five strips of land to plaintiff "to be used for railroad purposes only." *Id*. at 29. Plaintiff eventually extended the railroad to adjoining land in the north and it was agreed that plaintiff could transport sand on the railroad in addition to defendant's cottage owners. Passenger service ceased altogether in 1919 or 1920, and sand was hauled from that time on. *Id*. One of the parcels of land was conveyed to plaintiff via a quitclaim deed containing the following language:

[I]f, for any reason the property premises or land above described shall, for one year or longer, cease to be used for railroad purposes, . . . in that case all of the land herein described . . . shall revert to the Epworth Assembly . . . . [*Id.* at 29]

Plaintiff last operated a train on the track in February 1981. Thereafter, between 1982 and 1988, defendant erected a number of barricades across the strips of land, paved over two crossings, planted some trees, placed soil on some of the land, and ran a number of water and sewer pipes under the tracks. *Id* at 30.

In 1988, plaintiff brought an action seeking, among other things, a declaration of the interests of the parties in the five strips of land. *Id.* Plaintiff argued that the terminable interest, stated above, was held for a public purpose because a railroad is a common carrier that serves the public. This Court disagreed, finding that "Plaintiff is a private corporation that privately acquired its interest in the five strips of land from defendant, also a private organization, for railroad purposes." *Id.* at 39. The Court further stated, "In addition, the fact that the railroad was actually established and utilized, not for purposes of serving the general public, but first to serve defendant's individual members, and then to further private mining interests, further convinces us that the terminable interests in this case were not held for public purposes." *Id.* at 40.

Similarly here, the retention pond agreement was a private agreement between private parties. The retention pond itself was established not to benefit the public as whole, but to benefit plaintiff's land first and, if defendant decided to build on its land, to benefit defendant as well. The retention pond agreement and its contents involved no action by or at the direction of a government for the benefit of the community as a whole. Thus, the public purpose exception set forth in MCL 554.64(c) is inapplicable.

Defendant next asserts that the trial court abused its discretion in denying defendant leave to amend its counterclaims to add a claim for acquiescence to a boundary line. A trial court's decision on a motion to amend a pleading is reviewed for an abuse of discretion on appeal. *Weymers v Khera*, 454 Mich 639, 658; 563 NW2d 647 (1997). An abuse of discretion occurs when the trial court chooses an outcome falling outside a principled range of outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

In its proposed amended counterclaim, defendant sought to claim title to a small portion of the retention pond parcel. In its proposed amended counterclaim defendant stated that since it acquired its property in 2007, it has exclusively used and maintained the disputed property "as its own for purposes of maintaining a parking lot for business invitees" of defendant by:

a. Placing physical perimeter barricades separating the Disputed Property from the remainder of Troy 888's larger parcel;

b. General maintenance, surfacing, and cleaning of the Disputed Property;

c. Snow removal and de-icing of the Disputed Property in the general maintenance of its parking lot;

                d.      Painting of parking lines on the Disputed Property as it has been
        necessary.

Defendant asserted that, based on the aerial photographs of the property, its predecessors in
interest had taken the same actions with respect to the disputed property since at least 2000.
Defendant further asserted that plaintiff acquiesced to this boundary line between the properties
since at least 2000, making the disputed property now property a part of defendant's property.

        "The doctrine of acquiescence provides that where adjoining property owners acquiesce
to a boundary line for at least fifteen years, that line becomes the actual boundary line." *Killips v
Mannisto*, 244 Mich App 256, 260; 624 NW2d 224 (2001). An assertion of acquiescence does
not require that the possession be hostile or without permission, and the acquiescence of
predecessors in title can be tacked onto that of the parties in order to establish the mandated
period of fifteen years. *Id.*

        It is undisputed that plaintiff paid the taxes on the entire retention pond parcel.
Defendant asserts that parking blocks were placed along the alleged new boundary line for at
least 15 years. However, on some of the aerial black and white photographs of defendant's
parking lot from 2000 to the present, no parking blocks are visible. Additionally, defendant did
not assert that plaintiff did not use the property in question as well as defendant. The property at
issue concerns a parking lot open to the public. It is unclear how defendant could establish that
only it, or people coming to its building used the parking lot rather than a mix of people from
plaintiff's property, defendant's property, or even other nearby properties. And, while defendant
may have treated the disputed property as its own, for acquiescence to apply, *both* parties must
treat the property the same.

        In addition, in 2005 a "Cross Access-Joint Drive Easement" was recorded concerning the
two properties. The Easement was granted by plaintiff's predecessor to defendant's predecessor
to a "perpetual non-exclusive easement and right-of-way to and from Big Beaver Road and a
perpetual non-exclusive easement and right-of-way to and from Wilshire drive and the right of
construction, operation, maintenance and/or use of a driveway for ingress and egress . . . ." Part
of the easement was across the retention pond parcel in the southwest side of the property.
While this easement did not say "parking lot" it appears that all access drives to defendant's
building have parking in them, including the easement space. Had plaintiff acquiesced to the
purported boundary line as now alleged by defendant, there would have been no need for
defendant's predecessor to obtain the easement agreement in 2005 (also defeating the 15 year
requirement for acquiescence).

        Notably, despite not allowing defendant to amend its counterclaims, the trial court did
allow testimony by defendant's witness concerning the boundary between plaintiff and
defendant's properties. Albert Shulin testified that since defendant obtained the property in
2007, it has used the parking lot on the retention pond parcel and has maintained it. Shulin
testified that defendant has paved it, removed snow from it, and seal coated it. He testified that
on the retention pond parcel, at the fence line to the South, there is an access to the parking lot of
plaintiff. Shulin testified that there used to be parking bumpers along the edge of that parking
lot, but they have now been moved. Shulin did not testify or establish, however, that any
permanent or acknowledged boundaries were in place other than the true property lines.

-10-

Finally, defendant was aware that plaintiff owned the entire retention pond parcel due to the recording of the retention pond agreement in 1979. "Defendant's use with plaintiff's permission of property that was acknowledged to belong to plaintiff could not, as a matter of law, entitle defendant to acquire property rights . . . by . . . acquiescence." *W Michigan Dock & Mkt Corp v Lakeland Investments*, 210 Mich App 505, 512; 534 NW2d 212 (1995).

The trial court shall give the parties an opportunity to amend their pleadings when it has granted summary disposition pursuant to MCR 2.116(C)(8), unless doing so would be futile. *Ormsby v Capital Welding, Inc*, 471 Mich 45, 52–53; 684 NW2d 320 (2004). The trial court here was correct in finding that amendment of defendant's counterclaim would be futile.

Lastly, in docket no. 339349, plaintiff alleges that the trial court erred in failing to award it sanctions against defendant. We disagree.

"A trial court's decision on a motion for sanctions based on the failure to admit is reviewed for an abuse of discretion." *Midwest Bus Corp v Dept of Treasury*, 288 Mich App 334, 349–50; 793 NW2d 246 (2010). We also review a trial court's ruling on a motion for costs and attorney fees for an abuse of discretion. *Keinz v Keinz*, 290 Mich App 137, 141; 799 NW2d 576 (2010). "A trial court's findings of fact, such as whether a party's position was frivolous, may not be set aside unless they are clearly erroneous." *Id*.

Plaintiff asserts that the trial court clearly erred in refusing to award it sanctions under MCR 2.313(C), MCR 2.114, and MCL 600.2591. MCR 2.13(C) provides:

Expenses on Failure to Admit. If a party denies the genuineness of a document, or the truth of a matter as requested under MCR 2.312, and if the party requesting the admission later proves the genuineness of the document or the truth of the matter, the requesting party may move for an order requiring the other party to pay the expenses incurred in making that proof, including attorney fees. The court shall enter the order unless it finds that

(1) the request was held objectionable pursuant to MCR 2.312,

(2) the admission sought was of no substantial importance,

(3) the party failing to admit had reasonable ground to believe that he or she might prevail on the matter, or

(4) there was other good reason for the failure to admit.

"The purpose of MCR 2.312 has been stated as to limit areas of controversy and save time, energy, and expense which otherwise would be spent in proffering proof of matters properly subject to admission." *Richardson v Ryder Truck Rental, Inc*, 213 Mich App 447, 457; 540 NW2d 696 (1995) (quotation marks and citation omitted). That a matter was ultimately proved at trial does not by itself establish that the refusal to make the requested admission was unreasonable. *Id*. In general, the elements of a claim are not proper subjects of a request to admit. *Id*. at 457–458.

MCR 2.114 states, in relevant part:

(D) Effect of Signature. The signature of an attorney or party, whether or not the party is represented by an attorney, constitutes a certification by the signer that

(1) he or she has read the document;

(2) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and

(3) the document is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

(E) Sanctions for Violation. If a document is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages.

(F) Sanctions for Frivolous Claims and Defenses. In addition to sanctions under this rule, a party pleading a frivolous claim or defense is subject to costs as provided in MCR 2.625(A)(2). The court may not assess punitive damages.

This court rule imposes an affirmative duty on every attorney to conduct a reasonable inquiry into the factual and legal viability of a pleading before it is signed. *LaRose Market, Inc v Sylvan Center, Inc*, 209 Mich App 201, 210; 530 NW2d 505 (1995). The determination of whether reasonable inquiry was made employs an objective standard and depends largely on the facts and circumstances of the claim. *Id*.

Finally, MCL 600.2591 allows for the imposition of costs and fees for the filing of a frivolous action:

(1) Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the civil action by assessing the costs and fees against the nonprevailing party and their attorney.

(2) The amount of costs and fees awarded under this section shall include all reasonable costs actually incurred by the prevailing party and any costs allowed by law or by court rule, including court costs and reasonable attorney fees.

(3) As used in this section:

(a) "Frivolous" means that at least 1 of the following conditions is met:

-12-

(i) The party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party.

(ii) The party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true.

(iii) The party's legal position was devoid of arguable legal merit.

(b) "Prevailing party" means a party who wins on the entire record.

"To determine whether sanctions are appropriate under MCL 600.2591, it is necessary to evaluate the claims or defenses at issue at the time they were made," and "[t]he factual determination by the trial court depends on the particular facts and circumstances of the claim involved." *In re Costs & Attorney Fees*, 250 Mich App 89, 94–95; 645 NW2d 697 (2002). That the alleged facts are later discovered to be untrue does not invalidate a prior reasonable inquiry." *Jerico Const, Inc v Quadrants, Inc*, 257 Mich App 22, 36; 666 NW2d 310 (2003).

Plaintiff submitted a request to admit to defendant asking it to admit that "The City of Troy has not installed a permanent storm drainage system which serves the premises [] at any time subsequent to December 28, 1978." After deposing G. Scott Finlay, defendant provided a response denying the request to admit. At his deposition, Finlay testified that a permanent storm drainage system was connected to the retention pond in 1986 or 1987. When asked directly if the City of Troy installed a permanent storm drainage system to serve plaintiff and defendant's parcels, Finlay responded "There was a drainage system installed to service these parcels" but he did not know if the City of Troy installed it.

Based upon the above record, the trial court did not abuse its discretion in finding that sanctions were not warranted under MCR 2.313(C) because defendant had reasonable grounds to believe that it might prevail. Finlay's deposition testimony could easily lead one to believe that the City of Troy may have installed a permanent storm drainage system that served plaintiff and defendant's properties. It was simply unclear at the time of his deposition.

The trial court also did not clearly err in finding that defendant's position was not frivolous and thus did not abuse its discretion in denying plaintiff's request for sanctions under MCR 2.114 or MCL 600.2591. Again, defendant had the deposition testimony of Finlay and had no other relevant deposition testimony to clarify or deny that a storm drainage system had been installed by the City of Troy. Both parties conducted discovery and investigated this claim, based on a 40-year-old retention pond agreement. There is nothing to suggest that at the time defendant filed its answer, counterclaim or responses to the request to admit, that it had no basis to believe in its position or that it was pursuing this matter for frivolous purposes.

We affirm.

/s/ Deborah A. Servitto
/s/ Michael F. Gadola

-13-